RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0054p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

GEORGE EDWARD CLARK; KEVIN HARRINGTON,

      *Plaintiffs-Appellees*,

    *v.*

ANTHONY ABDALLAH; KEVIN SMITH,

      *Defendants-Appellants*.

No. 23-1730

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-10001—Victoria A. Roberts, District Judge.

Argued:  December 12, 2024

Decided and Filed:  March 13, 2025

Before:  BATCHELDER, MOORE, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Kali M. L. Henderson, SEWARD HENDERSON, PLLC, Royal Oak, Michigan, for Appellants.  Wolfgang Mueller, WOLF MUELLER LAW FIRM, Novi, Michigan, for Appellees.  **ON BRIEF:**  Kali M. L. Henderson, T. Joseph Seward, Michael A. Knoblock, SEWARD HENDERSON, PLLC, Royal Oak, Michigan, for Appellants.  Wolfgang Mueller, WOLF MUELLER LAW FIRM, Novi, Michigan, for Appellees.

     MOORE, J., delivered the opinion of the court in which BUSH, J., concurred, and BATCHELDER, J., concurred in part.  BATCHELDER, J. (pp. 32–39), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.    This § 1983 case concerns alleged constitutional violations in the investigation and prosecution of George Clark and Kevin Harrington.  Clark and Harrington spent nearly two decades in prison before the Wayne County Prosecution Integrity Unit determined that they did not receive a fair trial because their murder convictions were secured based on the testimony of a singular eyewitness, who claimed she had been coerced to lie by detectives.  Following dismissal of the charges and Clark's and Harrington's releases from prison, the men sued those detectives for violating their constitutional rights.

After discovery, the district court granted in part and denied in part the detectives' motion for summary judgment based on qualified immunity.  Specifically, the district court denied qualified immunity on the men's claims that the detectives fabricated the statement of the eyewitness, facilitated their prosecution without probable cause, and violated the *Brady* rule by withholding evidence that detectives threatened and offered benefits to key witnesses.  The detectives filed an interlocutory appeal on the denial of qualified immunity.  For the following reasons, we AFFIRM the district court's denial of qualified immunity and REMAND for trial on the merits.

## I.  BACKGROUND

### A.  Factual Background

Around 11 a.m. on September 27, 2002, a boy distributing church fliers discovered the body of man with gunshot wounds near a wooded area in Inkster, Michigan.  *Clark v. Abdallah*, No. 21-10001, 2023 WL 4852230, at *1 (E.D. Mich. July 28, 2023).  The young man flagged down a woman, Bearia Stewart, who identified the body as that of Michael Martin.  *Id.*; *see* R. 138-2 (Def. Martin Incident Report) (Page ID #4062).  Stewart called police, and Inkster Police detectives arrived on scene to investigate.  *Clark*, 2023 WL 4852230, at *1.  Stewart spoke with Detective Paul Martin and advised him that she saw George Clark at the house from 12 to 3 p.m.

the day before. *Id.* Stewart was then taken to the Inkster Police Department, where she was given Miranda warnings and interviewed for five hours by Detective Anthony Abdallah and Sergeant Kevin Smith ("Defendants"). *Id.*

At the outset of the interrogation, Stewart denied knowing anything about the murder "at least 26 times." *Clark*, 2023 WL 4852230, at *1. Detective Abdallah almost immediately suspected she was not telling the whole truth and began pressuring her to describe what happened. *See id.*; R. 138-3 (Revised Stewart Tr. at 9) (Page ID #4072). Abdallah began saying things like, "The faster you talk to us, the faster I can you get [sic] back home to your kids . . . The longer your kids are away from you, the faster – I mean, we – if you're going to stay here, we're going to call Social Services and have your kids picked up because you're locked up." R. 138-3 (Revised Stewart Tr. at 42) (Page ID #4105); *see Clark*, 2023 WL 4852230, at *1. Smith added, "We can't release you knowing that you know stuff." R. 138-3 (Revised Stewart Tr. at 42) (Page ID #4105). Stewart was crying and expressed that she was "scared." R. 138-3 (Revised Stewart Tr. at 28) (Page ID #4091). Abdallah suggested she was "scared because [she] didn't] want to be telling," but Stewart responded that she "kn[e]w nothing." *Id.*

"Faced with the threat of jail and the loss of her children, Stewart's story started to evolve." *Clark*, 2023 WL 4852230, at *1. As the police officers suggested versions of what might have occurred the night before, Stewart offered up a confusing array of stories. For example, Stewart stated that Clark had been to visit Martin and the two had been fighting, but she said this occurred from 11 to 3 in the evening. R. 138-3 (Revised Stewart Tr. at 8, 10–11) (Page ID #4071, 4073–74). Abdallah later suggested that Stewart "got up in the middle of the night and . . . saw something," which Stewart first denied, then admitted. *Id.* at 30–31 (Page ID #4093–94). Later, Stewart told Defendants that she had seen Clark's car at Martin's house around 11:30 p.m. *Id.* at 43 (Page ID #4106). Then she heard a gunshot and saw Clark get back to his car but did not see the shooting. *Id.* at 45 (Page ID #4108). At this point, Abdallah told Stewart that she was "that close to telling the truth" but "just won't cross over that line." *Id.* at 48 (Page ID #4111). Then, Defendants took an unrecorded, 40-minute break. *Clark*, 2023 WL 4852230, at *1.

Upon return from the break, the officers re-Mirandized Stewart, who was now prepared to offer a consistent narrative. *Clark*, 2023 WL 4852230, at *1; *see* R. 138-4 (Original Stewart Tr. at 36–37) (Page ID #4152–53). She told Defendants that around 11:00 to 11:30 p.m., she got up to smoke a cigarette, saw a grey car pull up outside, and noticed Clark knock on Martin's door. R. 138-4 (Original Stewart Tr. at 38) (Page ID #4154). She heard Martin and Clark argue and then saw Clark hit Martin in the chest. *Id.* Clark then walked back to his car before returning with his hand behind his back, this time saying he would kill Martin if he did not give Clark his money or his dope. *Id.* at 39 (Page ID #4155). Now, she said, Harrington stepped out of the car and the two men started beating Martin and dragged him to the bushes. *Id.* After that, Stewart heard gunshots. *Id.* at 40 (Page ID #4156). Stewart said she ran inside but soon heard a loud thumping on the door and voices demanding she open it. *Id.* It was Clark and Harrington threatening to blow up her house and her kids if she called the police. *Id.* After the interview, Stewart was allowed to return home.

Three days later, on September 30, 2002, Tyrhonda Moore went to talk with Inkster Police about the murder. *Clark*, 2023 WL 4852230, at *2. Moore told Abdallah that she was with Clark at the time he was allegedly murdering Martin. *Id.* She gave a statement saying that they had been at Martin's house but left around 10:30 p.m. and went to White Castle and a drive-in movie, returning to Martin's house around 3:30 or 4 a.m. R. 138-7 (Moore Statement at 1) (Page ID #4164). The next day, Clark told her that Martin had been killed. *Id.* In a recent deposition, Moore stated that during the interview, Abdallah immediately accused her of lying and began threatening her: "like I was in love with Mr. Clark, that's why I came down there lying and that I was gonna do time and I'm only 18 years old and I need to think about myself and—yeah. They were like all in my face, yelling and cussing." R. 138-17 (Moore Dep. Tr. at 44) (Page ID #4232); *see Clark*, 2023 WL 4852230, at *2. As she understood it, Abdallah wanted her to change her statement. *Clark*, 2023 WL 4852230, at *2. She said that the detectives "locked [her] up [in a holding cell] for . . . two, maybe three days . . . act[ing] like they were charging [her] with obstruction of justice." R. 138-17 (Moore Dep. Tr. at 45) (Page ID

#4233); *see Clark*, 2023 WL 4852230, at *2.  Moore has maintained that the statement she gave to police at that time was accurate.  R. 138-17 (Moore Dep. Tr. at 27–42) (Page ID #4215–30).[1]

Clark and Harrington were arrested on murder charges.  *Clark*, 2023 WL 4852230, at *2. Following their arrests, each man received a preliminary-examination hearing before a state judge to determine if there was probable cause for their continued detention.  *Id.*  Stewart's testimony was the sole, substantive evidence presented at the hearings.  *Id.* ("No other evidence linked them to the crime.").  Stewart testified consistent with the ultimate statement she gave to police, and the state judges found probable cause.  *Id.*

A day before Clark and Harrington's joint trial was scheduled to begin, Tammy Wiseman, a friend of Stewart's, was arrested for shoplifting in Taylor, Michigan.  *Clark*, 2023 WL 4852230, at *3.  Finding a subpoena to testify at Plaintiffs' trial in her purse, authorities contacted Abdallah.  *Id.*  Wiseman had been called as a defense witness in the case, and she planned to testify at trial that she was with Stewart on the night of Martin's murder, thereby impeaching Stewart's testimony that she witnessed the murder.  *Id.*  When she told this to Abdallah, he pressured her to change her story, telling her "'over and over and over' that she was lying and threatened to take her children away and lock her up unless she told him what he wanted to hear: that Plaintiffs threatened her into saying that she was with Bearia Stewart the night of the murder when she really was not."  *Id.* (quoting R. 138-20 (Wiseman Dep. Tr. at 83) (Page ID #4376)).  In a recent deposition, Wiseman affirmed that Abdallah was "giving [her] direction of what to say" and "basically telling [her] where [he] wanted [her] to go" with her story.  R. 138-20 (Wiseman Dep. Tr. at 84) (Page ID #4377).  Ultimately, needing to get out of jail and fearing that Abdallah would take away her children, *id.* at 84–86 (Page ID #4377–79), she told law enforcement that Plaintiffs' attorneys pressured her to lie on the stand to help their clients, *see* R. 138-19 (Wiseman Statement) (Page ID #4292); R. 138-20 (Wiseman Dep. Tr. at 56–57) (Page ID #4349–50).  In exchange for her support, Abdallah helped her get out of jail

---

[1]Moore never testified at Clark's or Harrington's trials.  Although Clark's counsel filed a notice of alibi as to Moore, he did not call her.  *See* R. 138-8 (Notice of Alibi) (Page ID #4167); R. 138-9 (Clark Affidavit ¶¶ 4–8) (Page ID #4169).

without paying the $500 bond originally set.  R. 138-20 (Wiseman Dep. Tr. at 84–85) (Page ID #4377–78).

At Clark and Harrington's joint trial, "Stewart took the stand but refused to answer questions." *Clark*, 2023 WL 4852230, at *2.  The judge deemed her unavailable and allowed the prosecution to admit her prior preliminary-examination testimony as substantive evidence.  *Id.*; *see* R. 153-10 (Stewart First Trial Test. at 118 (Page ID #5335)).  Wiseman was also called to testify.  Wiseman testified that she was not with Stewart on the night of the murder, but that Clark and Plaintiffs' counsel had tried to convince her to lie and say she was.  D. 37 (App'x at 280–88) (Wiseman First Trial Test. at 122–30); *see Clark*, 2023 WL 4852230, at *3.  She further testified that, once she gave her statement to law enforcement, she received threats to deter her from appearing in court.  *Clark*, 2023 WL 4852230, at *3.  Both men were convicted, although Harrington's conviction was thrown out due to attorney misconduct.  *Id.* at *2.

Harrington would be retried three times, with the next two trials resulting in hung juries.  *Id.*  At the final trial, Stewart continued to recant her prior testimony, and the court once again admitted her preliminary-examination testimony as substantive evidence against Harrington.  R. 153-11 (Fourth Stewart Trial Test. at 127–28) (Page ID #5543–44).  Stewart also told the jury that she had been "forced by the police" to inculpate Clark and Harrington because "[a]t the time I was scared of the police because they threatened to take my kids and put me in jail."  R. 153-11 (Fourth Stewart Trial Test. Day 1 at 153–54) (Page ID #5570–71); *see Clark*, 2023 WL 4852230, at *2.  Stewart also admitted that she had been addicted to cocaine at the time of the hours-long police interview.  R. 153-11 (Fourth Stewart Trial Test. Day 2 at 38) (Page ID #5669).  At this trial, Wiseman recanted her earlier trial testimony and testified that she "***was*** with Stewart on the night of the murder."  *Clark*, 2023 WL 4852230, at *3.  She also testified on cross-examination that she lied to Abdallah because she was desperate to get out of jail and back to her three children, and that she had a heroin and crack-cocaine addiction at the time.  *Id.*  Further, she testified that in exchange for her false statements, Abdallah arranged her release from jail without paying bail.  *Id.*  Nonetheless, Wiseman's earlier statement and trial testimony were

admitted into evidence.  D. 37 (App'x at 493) (Wiseman Fourth Trial Test. at 78).  Harrington finally was convicted.[2]

After many years of unsuccessful appeals and habeas applications, Clark finally brought a second or successive habeas application with potential merit.  The application was based on newly discovered evidence and relied on an affidavit from a new witness, Kaneka Jackson, who said she saw a different man place a gun behind Martin's head and walk him into the woods before hearing three gunshots.  *See In re Clark*, No. 15-2156, 2016 WL 11270015, at *3 (6th Cir. Mar. 28, 2016).  Jackson claimed that she told her father, Inkster Police Lieutenant Gregory Hill, what she had witnessed, but he told her to stay quiet so as not to endanger herself.  *Id.*  We granted Clark's motion to file a second or successive petition as to the potential *Brady* violation, *id.*, and later ordered an evidentiary hearing, *Clark v. Warden*, 934 F.3d 483, 494 (6th Cir. 2019).

Meanwhile, the Wayne County Prosecutor's Office Conviction Integrity Unit ("CIU") conducted a six-month investigation into the case.  *See* R. 138-22 (Press Release) (Page ID #4438).  On April 23, 2020, the CIU announced that its investigation revealed "new witnesses and evidence" and "established that Mr. Harrington and Mr. Clark did not receive a fair trial as a result of the conduct of the original lead detective," including a "*disturbing* pattern of behavior . . . that involved threatening and coercing a number of witnesses."  *Id.*  The CIU noted that no physical evidence linked Clark or Harrington to the crime scene, and the "only inculpatory witness repeatedly said they saw nothing and that they were coerced."  *Id.* (Page ID #4437–38).  The charges were dismissed, and the CIU announced that the case would not be retried; the office did not reach any conclusion regarding their actual innocence.  *Id.*  Clark and Harrington subsequently received compensation under the Michigan Wrongful Imprisonment Compensation Act.  *See Clark v. Abdallah*, No. 21-10001, 2023 WL 4851410, at *1 (E.D. Mich. July 28, 2023).

---

[2]Defendants' statement of facts puts a different spin on these events, persisting in the belief that Plaintiffs are guilty of murder, downplaying the severity of Defendants' alleged misconduct, and arguing that the *real* reason Stewart and Wiseman recanted their testimony is that they were terrified of Plaintiffs.  Although Defendants may present these theories—and the facts on which they rest—to the jury, we cannot entertain them at the summary-judgment stage.  On Defendants' motion for summary judgment, we portray the facts in the light most favorable to the Plaintiffs and consider whether Defendants are nonetheless entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

**B.  Procedural Background**

Clark and Harrington filed the present suit against Detective Abdallah, Sergeant Smith, Lieutenant Hill, and the City of Inkster, on January 4, 2021.  The operative, amended complaint alleged:  (1) Abdallah and Smith deliberately and knowingly fabricated evidence to secure their convictions, including threatening and coercing Stewart, Moore, and Wiseman to make false, inculpatory statements, contrary to the Fourth and Fourteenth Amendments (Count I); (2) Abdallah and Smith maliciously prosecuted them by the same means in violation of the Fourth Amendment (Count II); (3) Abdallah, Smith, and Hill violated their rights to due process under the Fourteenth Amendment and a fair trial under the Sixth Amendment by not disclosing material exculpatory evidence relating to Moore, Wiseman, and Jackson under *Brady* (Count III); (4) the City of Inkster demonstrated deliberate indifference to their constitutional rights and was subject to municipal liability under *Monell* (Count IV); and (5) Abdallah, Smith, and Hill maliciously prosecuted them under Michigan common law (Count V).  R. 73 (Am. Compl. ¶¶ 97–120) (Page ID #2250–56).

After discovery, Abdallah, Smith, and the City of Inkster moved for summary judgment. The district court granted summary judgment to the City of Inkster based on Clark's and Harrington's voluntary release of liability against the city upon acceptance of monetary awards under the Michigan Wrongful Imprisonment Compensation Act.  *Clark*, 2023 WL 4851410, at *1.  That decision is not challenged here.  The district court then granted in part and denied in part Abdallah's and Smith's motions for summary judgment based on qualified immunity. *Clark*, 2023 WL 4852230, at *18.  The district court granted qualified immunity to Abdallah with respect to claims that he fabricated Moore's statement and withheld the Jackson evidence under *Brady*.  *Id.*  But the district court denied qualified immunity to Abdallah with respect to claims that he fabricated Stewart's and Wiseman's testimonies, engaged in federal and state malicious prosecution, and violated *Brady* with respect to evidence pertaining to Moore and Wiseman.  *Id.*  The district court granted qualified immunity to Smith with respect to fabricating the Wiseman and Moore testimony, as well as to all the *Brady* claims.  *Id.*  But the court denied qualified immunity to Smith with respect to fabricating Stewart's eyewitness testimony and to

the federal and state malicious-prosecution claims. *Id.* Smith and Abdallah now seek interlocutory review of the denial of qualified immunity.

## II.  STANDARD OF REVIEW

To prevail on a claim under 42 U.S.C. § 1983, Plaintiffs "must establish that a person acting under color of state law deprived [them] of a right secured by the Constitution or laws of the United States." *Adams v. Blount County*, 946 F.3d 940, 947 (6th Cir. 2020) (quoting *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006)).  Responding to a § 1983 claim, an officer may assert the defense of qualified immunity, which shields officers from damages suits unless their conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When an officer asserts this defense at summary judgment, the burden shifts to the plaintiffs to demonstrate that (1) the facts, taken in the light most favorable to the plaintiffs, show that the officer violated their constitutional right, and (2) the right was so clearly established at the time of the officer's conduct that the officer would have understood that he was violating the plaintiffs' rights. *Tanner v. Walters*, 98 F.4th 726, 731 (6th Cir. 2024); *see Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Summary judgment is properly denied when plaintiffs have offered evidence sufficient to raise a genuine dispute of material fact as to whether the officer violated their clearly established rights. *Tanner*, 98 F.4th at 731; *see* Fed. R. Civ. P. 56(a).  We review the district court's denial of summary judgment on qualified-immunity grounds de novo. *Tanner*, 98 F.4th at 731.

## III.  JURISDICTION

We begin by determining the scope of our jurisdiction over this appeal from the denial of summary judgment on qualified-immunity grounds.  Ordinarily, we lack jurisdiction to review a district court's order denying summary judgment because denials of summary judgment are not "final decisions" within the meaning of 28 U.S.C. § 1291. *See Johnson v. Jones*, 515 U.S. 304, 309 (1995).  "[I]nterlocutory appeals—appeals before the end of district court proceedings—are the exception, not the rule." *Id.*  A district court's order denying summary judgment falls within a limited exception for collateral orders when the officer asserts a defense of qualified immunity

and the "the appealable issue is a purely legal one." *Id.* at 313 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985)). In such cases, the appealed order is properly considered collateral because it conclusively determines a legal question, resolves an important issue separate from the merits, and would be unreviewable on appeal from final judgment, for the officer would have lost his immunity from suit. *See id.* at 310–12.

In an interlocutory appeal from the denial of summary judgment on qualified-immunity grounds, we have jurisdiction to review whether the plaintiffs' evidence—if proved at trial— would demonstrate a violation of a constitutional right, and whether that right was clearly established at the time it was allegedly violated. *See Plumhoff v. Rickard*, 572 U.S. 765, 774, 778 (2014). However, we lack jurisdiction to entertain challenges to the district court's determination that the plaintiffs' evidence is sufficient to proceed past summary judgment to trial. *Johnson*, 515 U.S. at 313. An officer "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319–20. Evidence-sufficiency claims are not final because they do not present any legal question other than the one to be answered at trial. *Id.* at 314–15.

In ruling on interlocutory appeals from the denial of qualified immunity, we generally adopt the facts as set forth by the district court and defer to the district court's determinations of fact and the inferences that the district court drew from those facts. *Gillispie v. Miami Township*, 18 F.4th 909, 916 (6th Cir. 2021). "[I]n exceptional circumstances," we may review "the district court's factual determination if that determination is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Adams*, 946 F.3d at 948 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

When an officer raises both factual and legal challenges, we determine the scope of our jurisdiction by "separat[ing] an appellant's reviewable challenges from its unreviewable" ones. *Id.* (quoting *Diluzio v. Village of Yorkville*, 796 F.3d 604, 610 (6th Cir. 2015)); *see also Johnson*, 515 U.S. at 313 (finding no jurisdiction over appeals from the "*portion* of a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency'" (emphasis added)). We will overlook an officer's attempt to dispute the facts if he is nonetheless willing to concede the most favorable view of the facts to

the plaintiffs for purposes of another aspect of the appeal. *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 472 (6th Cir. 2014); *see, e.g.*, *Ashford v. Univ. of Michigan*, 89 F.4th 960, 970 (6th Cir. 2024) (setting aside fact-based challenge and resolving purely legal challenge to whether defendants violated clearly established law). We will also put aside factual disputes that are minor or ultimately immaterial. *Adams*, 946 F.3d at 951. But "[a]dhering to *Johnson*, we have consistently declined to exercise jurisdiction over appeals where the officer's dispute of facts is 'crucial to' the appeal." *Heeter v. Bowers*, 99 F.4th 900, 909 (6th Cir. 2024) (quoting *Adams*, 946 F.3d at 951) (collecting cases). When we cannot resolve the legal question without grappling with the parties' factual dispute, we dismiss for lack of jurisdiction. *See, e.g.*, *Gillispie*, 18 F.4th at 919; *Adams*, 946 F.3d at 951.

Defendants have not fully conceded the facts in this appeal. Throughout their briefing, Defendants resist Plaintiffs' factual allegations and the inferences that the district court drew from them. For example, Defendants continue to insist that Stewart recanted her testimony at trial because she was threatened, and not because her preliminary-examination testimony was fabricated. *See* D. 32 (Defs.' Br. at 43). They dispute whether Plaintiffs' evidence shows that Defendants knew Stewart's testimony was false. *See id.* at 38. And they persist in arguing that Wiseman made up her own story. *See id.* at 40. Although we lack jurisdiction over such fact-based disputes, many of the issues in this appeal can be decided without entertaining them. We proceed carefully and avoid these issues as they arise.

However, one issue must be resolved entirely on jurisdictional grounds. Defendants argue that Stewart's trial testimony is inadmissible hearsay that cannot be used to prove that she was coerced by Defendants to change her story. D. 32 (Defs.' Br. at 28–31). The district court held that the testimony was admissible under Federal Rule of Evidence 804(b)(1) because Stewart is now dead (and therefore unavailable), the testimony was taken at trial, and the predecessor in interest to the police officers (the prosecutor) had an opportunity and similar motive to develop her testimony during direct and redirect examination. *Clark*, 2023 WL 4852230, at *17–18.

We have no jurisdiction to decide whether the district court correctly determined that Stewart's trial testimony is admissible. When an officer's appeal rests crucially on a dispute

over the admissibility of evidence, we lack jurisdiction to review the appeal. *Ellis v. Washington County*, 198 F.3d 225, 229 (6th Cir. 1999). This is true even if the *only* evidence precluding summary judgment amounts to the "rankest type of inadmissible hearsay." *Id.*; *see Harmon v. Hamilton County*, 675 F. App'x 532, 540 n.5 (6th Cir. 2017) (refusing to consider defendant's objection to district court's reliance on certain evidence to find a genuine dispute of material fact); *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *4 (6th Cir. Feb. 2, 2009) (declining to "revisit or review evidentiary rulings" including a district court's resolution of a hearsay objection). Defendants' effort to frame this as a challenge to the district court's application of the summary-judgment standard is unpersuasive. D. 32 (Defs.' Br. at 28). Defendants are challenging the district court's determination whether the trial testimony is inadmissible hearsay. Resolution of this jurisdictional challenge does not deprive us of jurisdiction over the rest of the appeal, however, because Defendants appear willing to concede the admissibility of the evidence for purposes of their other arguments. *See Bertl*, 2009 WL 247907, at *4. We assume the same.

## IV. FABRICATION OF EVIDENCE

Plaintiffs' first claim is that Defendants violated their right to Due Process under the Fourteenth Amendment by causing the introduction of fabricated evidence—the testimony of Stewart and Wiseman—at their jury trials. The district court held that Plaintiffs presented sufficient evidence to create a genuine dispute of material fact as to whether the testimonies were knowingly fabricated. Defendants raise several legal challenges to Plaintiffs' fabrication-of-evidence claims. We address each in turn.

### A. Fabrication of Evidence Under the Fourth and Fourteenth Amendments

As a threshold matter, Defendants argue that the district court erred by considering Plaintiffs' fabrication-of-evidence claim as a violation of the Due Process Clause of the Fourteenth Amendment, rather than as a violation of the right to be free from unlawful seizures under the Fourth Amendment. D. 32 (Defs.' Br. at 31). To the extent that this is an argument about the legal viability of a stand-alone fabrication-of-evidence claim based on the Fourteenth Amendment, the argument is a nonstarter because we have recognized fabrication-of-evidence

claims under the Fourth and Fourteenth Amendments.  *See Hoskins v. York*, No. 23-5325, 2024 WL 2894648, at *2 (6th Cir. June 10, 2024).

The Fourth Amendment's protection against unreasonable seizures prohibits the government from arresting and detaining individuals without probable cause that they committed an offense.  *See Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017).  The Fourth Amendment is violated when probable cause rests on fabricated evidence presented to a grand jury or to a judge determining probable cause.  *King v. Harwood*, 852 F.3d 568, 588–90 (6th Cir. 2017); *see Manuel*, 580 U.S. at 367 (observing that probable cause is lacking "when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements").  When individuals present claims that they were unlawfully detained based on fabricated evidence, we tend to consider them under the rubric of malicious prosecution.  *See Tanner*, 98 F.4th at 733–34 ("Claims stemming from a plaintiff's seizure and continued detention based on purportedly false or fabricated evidence presented by law enforcement fall under the broad umbrella of malicious prosecution and are rooted in the protections afforded by the Fourth Amendment.").  Because Fourth Amendment claims turn crucially on the lack of probable cause, a law-enforcement defendant may defeat liability by showing that, notwithstanding the fabricated evidence, probable cause supported detention.  *Id.* at 735–36.

The Fourteenth Amendment, by contrast, prohibits the government from depriving a person of liberty without due process of law.  *See* U.S. Const. amend XIV, § 1.  The due-process right is infringed when the prosecution presents "evidence [that] is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Jackson v. City of Cleveland*, 925 F.3d 793, 815 (6th Cir. 2019) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006)).  Because the core of the right at issue here is not the deprivation of liberty but the right to a fair trial, "a stand-alone fabrication-of-evidence claim can survive without regard to probable cause." *Tanner*, 98 F.4th at 733.  In sum, Defendants' argument that Plaintiffs cannot raise a stand-alone fabrication-of-evidence claim under the Due Process Clause is foreclosed by our precedent.

To the extent that Defendants' argument turns on what is pleaded in the operative complaint, the argument also fails.  *See* D. 32 (Defs.' Br. at 33) (contending that "Plaintiffs'

fabrication claim relies on the right not to be seized and deprived of liberty as the result of manufactured probable cause"). The operative complaint put Defendants on notice that Plaintiffs were asserting violations of their rights under the Fourth and Fourteenth Amendments. Plaintiffs alleged that Defendants violated their right to be free from unlawful seizures by "deliberately and knowingly fabricat[ing] evidence to manufacture probable cause for an arrest warrant." R. 73 (Second Amended Compl. ¶ 100) (Page ID #2250). But Plaintiffs also asserted that Defendants violated their "right to be free from . . . prosecution based on fabrication of evidence" and alleged that the Defendants used the fabricated evidence "to later secure Plaintiffs' convictions." *Id.* ¶¶ 99–100 (Page ID #2250–51). And in support of their claims, Plaintiffs cited *Jackson*, a case concerning a due-process violation premised on fabrication of evidence. *Id.* ¶ 98 (Page ID #2250) (citing *Jackson*, 925 F.3d at 816). It was therefore not error for the district court to read the operative complaint to raise a due-process claim.

## B. Constitutional Violation

Moving on, Defendants argue that Plaintiffs have not demonstrated a constitutional violation on the fabrication-of-evidence claim. The elements of a fabrication-of-evidence claim under the Due Process Clause are (1) the evidence was knowingly fabricated, and (2) the evidence likely affected the decision of the jury. *Jackson*, 925 F.3d at 815. Defendants dispute whether a jury could infer that Stewart's and Wiseman's testimonies were knowingly fabricated.

The district court's conclusion that genuine fact issues remained as to whether Defendants fabricated Stewart's inculpatory preliminary-examination testimony (which was presented at their trials) rested on the following facts from the record: (1) Stewart repeatedly denied knowing anything about the crime; (2) Stewart told inconsistent stories; (3) Defendants were aware of Moore as an alibi witness for Clark; and (4) Defendants "pressured [Stewart] into giving a statement by threatening to take away her children." *Clark*, 2023 WL4852230, at *10. "Taken together," the district court reasoned, "a reasonable jury could find that Defendants fabricated evidence (Stewart's preliminary exam testimonies) against Plaintiffs by coercing her to testify to something they knew or had reason to know was false." *Id.* In reaching this conclusion, the district judge "[did] not dispute that coercion alone, without more, cannot rise to

the level of fabrication." *Id.* at *9. But, in the court's view, the preceding facts showed "more than just coercion." *Id.*

As to Wiseman, the district court held that Plaintiffs raised a genuine dispute of fact as to whether Abdallah coerced her to testify falsely at the first trial that "Plaintiffs and their counsel pressured Wiseman to testify that she was with Bearia Stewart the night of the murder, even though she was not." *Clark*, 2023 WL 4852230, at *10. In support of this holding, the district court pointed to the following facts: (1) Abdallah interviewed Wiseman while she was in jail; (2) Abdallah insinuated that he would help Wiseman with her case if she testified against Plaintiffs (and arranged for her release without bond); (3) Abdallah threatened to take away Wiseman's children; (4) Wiseman was suffering from drug withdrawal; and (5) Wiseman has stated that "Abdallah told her 'over and over and over' that she was lying, and that he threatened to take her children away and lock her up unless she told him what he wanted to hear." *Id.* at *10. The district court rejected Abdallah's argument that because he "didn't tell her what to say," the testimony could not have been fabricated. *Id.* at *11. The court pointed, in this regard, to Wiseman's statement that when she told the truth, Abdallah responded by saying, "'over and over' that she was lying, threatened to take away her kids, and threatened to lock her up." *Id.*

Defendants' rebuttal rests on a piecemeal approach. Their argument is that because each fact alone would not independently support a jury's conclusion that Defendants fabricated evidence, a jury could not conclude that these facts, taken together, support a conclusion that Defendants knowingly fabricated evidence. But even if each fact alone would not support a fabrication claim, the conclusion does not follow that the *combination* of facts could not support an inference that officers knew the statement they procured was false. The sum, as we all know, may be greater than each of its parts. For example, a doctor might be unable to diagnose the flu solely because a child had a fever, runny nose, vomiting, or extreme fatigue. But when a child comes into the doctor's office with all four symptoms, she might fairly infer that the child has the flu rather than the common cold. Analogously, a police officer might be unlikely to infer that a witness is giving false testimony based solely on the inconsistency of the testimony with that of another witness (the other witness, of course, could be lying), or based solely on the coercive tactics used to extract the statement (some witnesses are recalcitrant, after all). But we expect

that police officers can piece together the information they develop throughout the investigation to reach important conclusions, such as who committed the crime, and whether a witness is telling the truth.

Of course, the argument might have more merit if each of the identified facts were irrelevant or only marginally relevant to the conclusion that a witness's testimony was false. But the factors here cannot be so characterized. Even if coerced testimony "may turn out to be true," coercion is not "legally irrelevant; far from it—coercion (which in an extreme case could amount to torture) may be an essential tool in 'persuading' a witness to fabricate testimony." *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) (allowing an inference of fabrication when the officers "used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information"). And although it is "[i]t is generally accepted that a showing of inconsistent statements will not make the testimony incredible as a matter of law[,] [s]uch contradictions [] reflect on the accomplice's credibility, and it is for the trier of fact to determine their weight." *United States v. Burch*, 471 F.2d 1314, 1317 (6th Cir. 1973). Further, even if an alibi might be dubious or self-serving, alibi-witness testimony can diminish the credibility of other witnesses. *Cf. Stewart v. Wolfenbarger*, 468 F.3d 338, 361 (6th Cir. 2006) (concluding that, where the prosecution's evidence was thin, failure to present alibi witnesses "undeniabl[y]" prejudiced the defendant). Each of the facts identified by the district court is highly relevant to the jury's determination whether an officer knew that the statement procured from a witness was false. *See Winslow v. Smith*, 696 F.3d 716, 734 (8th Cir. 2012) (concluding that officers "may be held liable if they recklessly ignored evidence suggesting the Plaintiffs' innocence or systematically pressured witnesses to manufacture false testimony to fill gaps in an investigation"). Accordingly, we see no legal reason why the combination of factors presented here could not support a jury verdict in Plaintiffs' favor.

Defendants similarly argue that the evidence does not support a claim of knowing fabrication because the tactics used to interview Stewart and Wiseman were "constitutional." D. 32 (Defs.' Br. at 37). The argument seems to be that because the officers' tactics were not *so* coercive as to violate Stewart's and Wiseman's Fourteenth Amendment rights to be free from

giving a constitutionally involuntary statement, a jury could not infer that Defendants knew their statements to be false. *Id.* at 37–38. In support of their argument, Defendants cite cases supporting propositions such as "officers could lawfully tell Stewart she was lying" and "[l]awfully, Defendants could also tell Stewart she would be locked up for not telling the truth and that social services would be called to watch after her children." *Id.* This argument fails for the same reason as the first one. Although it may be true that application of each of these tactics would not render the witness's statement constitutionally involuntary, it does not follow that when an officer uses these tactics *together*, he could not infer that the witness's story was false or at least highly unreliable. Indeed, Defendants have pointed us to no authority for their proposition that when the witness's "interview was constitutional, [] there was no fabrication." *Id.* at 37.

Defendants identify only one precedential case supporting summary judgment on a somewhat similar combination of factors. In *Price v. Montgomery County*, we affirmed the district court's grant of summary judgment on a fabrication-of-evidence claim. 72 F.4th 711, 724 (6th Cir. 2023). In that case, the plaintiff presented evidence of officers

> failing to record large segments of the interrogation, misleading [the witness] about her DNA being a match and other people implicating her, telling [the witness] information that she would need to sound plausible in her confession, threatening her and her children, promising her that she would go free if she cooperated, and telling her that she failed the polygraph test.

*Id.* at 723. Here, as in *Price*, there is evidence that the officers threatened Stewart and Wiseman and threatened to take away their children, and with respect to Stewart that they ignored inconsistent evidence and failed to record the entire interview (raising questions about what other threats or promises were made during a 40-minute unrecorded break).

However, *Price* is distinguishable. First, as the district court recognized, when Stewart gave her preliminary-examination testimony, Defendants were aware of an alibi witness for Clark, which cast significant doubt on the veracity of Stewart's story and lent some credence to Wiseman's. Notwithstanding the many inconsistencies in Stewart's testimony and her repeated denials that she knew anything of the murder, Defendants never tried to reinterview her or consider whether her story was true or false. Second, there is evidence in the record that both

Stewart and Wiseman were interrogated while they were withdrawing from drugs, factors that made them especially vulnerable to police suggestion and coercion, and reasonably afraid that their children might be removed if they did not tell the story that officers wanted to hear. Third, there is evidence that the officers were engaged in a pattern of coercive and manipulative behavior, which supports the conclusion that Defendants were determined to convict Plaintiffs regardless the truth of the statements they elicited.

Because we have identified no legal obstacle to the inference that Defendants *knew* that Stewart's and Wiseman's statements were false, Defendants' arguments boil down to a dispute with the sufficiency of the evidence in this case. Stripping away the legal arguments, their contention is that the evidence is too thin to support a jury verdict on the fabrication-of-evidence claim. That kind of argument is plainly foreclosed by *Johnson v. Jones*.[3] So, we have no jurisdiction to entertain it further.

Defendants lastly make a terse argument that the fabrication-of-evidence claim regarding Stewart fails because the prosecutor independently used the allegedly fabricated evidence to convict Plaintiffs. D. 32 (Defs.' Br. at 39–40). Defendants contend that the prosecutor's actions operated as a "superseding cause" because "the prosecutor had both the audio and video portions of Stewart's interview—and the prosecutor admitted that evidence against Plaintiffs, causing their convictions." *Id.* at 39. Effectively, because the officers did not withhold evidence about the coercion they applied to Stewart, Defendants say they are absolved from responsibility for fabricating her statement.

Binding, on-point caselaw forecloses that argument. In *Jackson*, we held that causation is sufficiently established when an officer fabricates a statement by the witness, which is subsequently introduced into evidence at trial. 925 F.3d at 816. Once the statement was created, the officer was causally responsible "because the statement coerced [the witness] to testify in conformance with it" under penalty of perjury. *Id.* at 817; *accord Monson v. City of Detroit*, Nos. 22-2050/2122, 2024 WL 84093, at *7–8 (6th Cir. Jan. 8, 2024). Here, taking the facts in

---

[3]We also lack jurisdiction to consider Defendants' argument that the evidentiary record better supports the position that Wiseman's false testimony was "of her own making" rather than of Abdallah's. D. 32 (Defs.' Br. at 40).

the light most favorable to Plaintiffs, Defendants elicited a false statement from Stewart before the preliminary exams; Stewart testified in conformity with that statement; and even when Stewart tried to recant her preliminary-examination testimony, it was used substantively to obtain Plaintiffs' convictions. Even if that first statement was not given under oath like the statement in *Jackson*, had Stewart disowned her statement at the preliminary examination, she may have been subject to penalties for giving false evidence to police in a murder investigation. *See* Mich. Comp. Laws § 750.479c.

Defendants' citation to *McDonough v. Smith* does not undermine our analysis. 588 U.S. 109 (2019). *McDonough* merely repeats the unremarkable proposition that a § 1983 plaintiff must show that the defendant is causally responsible for the constitutional deprivation. *Id.* at 117. Accordingly, in the context of the fabrication-of-evidence claim asserted under the rubric of malicious prosecution in *McDonough*, the plaintiff was "require[d] . . . to show that the criminal proceedings against him—and consequent deprivations of his liberty—were caused by [the defendant's] malfeasance in fabricating evidence." *Id.* (footnote omitted). Taking the facts in the light most favorable to the Plaintiffs, Defendants *caused* Plaintiffs' convictions and corresponding detention by obtaining Stewart's false statement, to which she was then required to testify under penalty of law. Accordingly, because "[t]his scenario parallels *Jackson*," *Monson*, 2024 WL 84093, at *8, we reject Defendants' causation argument.[4]

---

[4]Defendants also rely on out-of-circuit cases to support their argument, but none of them is persuasive here. First, Defendants cite two Second Circuit decisions concluding that a police officer was not liable for the admission of certain evidence at trial unless the prosecutor or judge was misled or unduly pressured by the police officer. *See Wray v. City of New York*, 490 F.3d 189, 193 (2d Cir. 2007); *Townes v. City of New York*, 176 F.3d 138, 146–47 (2d Cir. 1999). Those cases are distinguishable because neither considered the type of evidence at issue here or in *Jackson* and *Monson*. Rather, *Wray* concerned "the erroneous admission at trial of testimony regarding [an] unduly suggestive identification," 490 F.3d at 193, while *Townes* concerned the introduction of improperly seized evidence, 176 F.3d at 146–47. In neither case had the police officer elicited a false statement to which the witness was required to testify under penalty of law. Accordingly, the causal nexus presented here was not at issue in those cases.

Second, Defendants cite *Evans v. Chalmers*, which held that an officer is not liable for malicious prosecution unless he misled or pressured the prosecutor. 703 F.3d 636, 647–48 (4th Cir. 2012). This case is both factually distinguishable—arising in the context of a different claim and in light of evidence that the officers resisted the prosecutor's inappropriate pursuit of the case—and in tension with our precedent on the same point. We have not adopted such a high standard for causation in malicious-prosecution cases, holding instead that an officer may be liable when "misstatements and falsehoods in his investigatory materials extended beyond the Plaintiffs' initial arrest and ultimately influenced the Plaintiffs' continued detention." *Sykes v. Anderson*, 625 F.3d 294, 316 (6th Cir. 2010). In sum, Defendants' out-of-circuit authority does not alter our analysis.

## C.  Clearly Established Law

Defendants also argue that Plaintiffs have not demonstrated that they violated clearly established law.  The Supreme Court has admonished us "not to define clearly established law at a high level of generality."  *Ashcroft*, 563 U.S. at 742.  Our focus must be on "whether the violative nature of *particular* conduct is clearly established . . . in light of the specific context of the case."  *Guertin v. Michigan*, 912 F.3d 907, 934 (6th Cir. 2019) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

As long ago as 1942, "the Supreme Court held that when a witness perjures himself because of threats from police officers, the defendant suffers 'a deprivation of rights guaranteed by the Federal Constitution.'"  *Jackson*, 925 F.3d at 825 (quoting *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)).  Because of this, Defendants were surely on notice in 2002 that threatening Stewart and Wiseman to give false testimony to convict Plaintiffs was a violation of Plaintiffs' clearly established due-process rights.  *Id.*  Defendants insist that this defines the right "too generally." D. 32 (Defs.' Br. at 40).  They argue that "there was no caselaw putting the Officers on notice that their interrogation techniques would cross the line from coercion to fabrication," so they could not have known that they were violating Defendants' constitutional rights.  *Id.* at 41. Defendants' argument is simply another attempt to relitigate the question whether a jury could infer that they *knew* the statements were fabricated.  We have already addressed that question. The relevant question at this juncture is whether, when an officer knows that evidence is fabricated, it is clearly established that introduction of that evidence at trial violates an individual's rights.  That proposition of law was firmly established when this violation occurred.

Defendants finally argue that "the heart of a fabrication claim is that law enforcement fed a witness information to establish probable cause."  D. 52 (Defs.' Reply at 6).  This argument is also unpersuasive.  Beginning with *Mooney v. Holohan*, the Supreme Court recognized that it deprives a defendant of due process to solicit his conviction "through a deliberate deception of court and jury by the presentation of testimony known to be perjured."  294 U.S. 103, 112 (1935).  Subsequently, in *Miller v. Pate*, the Supreme Court identified a violation of the *Mooney* principle when the prosecutor knowingly allowed false testimony that a pair of shorts was covered with blood when he knew it was covered in paint.  386 U.S. 1, 6–7 (1967).

This amounted to fabrication even though there was no suggestion that the prosecution planted blood on the shorts. *Id.* at 6. If Plaintiffs can prove at trial that Defendants knew that the statements they elicited from Stewart and Wiseman, which were later conveyed to the jury, were false, it follows that Defendants violated clearly established law. Hence, we will affirm the district court's denial of summary judgment on the fabrication-of-evidence claims.

## V. FEDERAL MALICIOUS PROSECUTION

Plaintiffs' next claim is that Defendants violated their Fourth Amendment rights to be free from unreasonable seizure by maliciously prosecuting them without probable cause. To demonstrate malicious prosecution, a plaintiff must show that: "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Tanner*, 98 F.4th at 734 (quoting *France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016)).

Defendants challenge only the second element of the federal malicious-prosecution claim—whether there was a lack of probable cause. D. 32 (Defs.' Br. at 42–43). On that score, the district court held that Plaintiffs raised sufficient evidence to create a genuine dispute of material fact. *Clark*, 2023 WL 4852230, at *13. "Given that Stewart's eyewitness testimony was the only evidence used to establish probable cause and Plaintiffs allege the testimony to be fabricated, fact issues exist to support that there was no probable cause to prosecute Plaintiffs." *Id.* at *12.

Echoing their earlier arguments, Defendants contend that "Stewart's statement was taken constitutionally . . . [t]hus, Defendants were entitled to rely upon it to establish probable cause." D. 32 (Defs.' Br. at 42). This argument is unpersuasive. Probable cause exists when the prosecution has "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [prosecuted party] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

> A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest . . . unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.

*Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (citations omitted). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000)).

Here, Defendants' argument fails because, as we have already explained, Plaintiffs have created a triable question as to whether Stewart's testimony was fabricated. And probable cause, of course, is not supported by fabricated evidence. *See Manuel*, 580 U.S. at 367; *King*, 852 F.3d at 587–88. Further, even if a jury concluded that the evidence was not fabricated, the jury could still find that "there [was] an apparent reason for the officer[s] to believe that [Stewart] was lying." *Ahlers*, 188 F.3d at 370 (citation omitted). Accordingly, a jury could find that the testimony was not sufficiently reliable to establish probable cause.

Defendants put emphasis on the contents of Stewart's testimony at the preliminary examinations and argue that the testimony she gave there was sufficient to establish probable cause. *See* D. 32 (Defs.' Br. at 42–43). But it is immaterial that Stewart's statement contained numerous allegations that, if trustworthy, would have sufficed. *See id.* (citing Stewart's statements that "Clark is a drug dealer and is known to carry a gun," "Martin was murdered with a gun over a drug/money dispute," and "Clark and Harrington [were] at the scene of the murder"). The crucial question is whether Stewart's testimony was fabricated or, at least, whether her testimony was unreliable. Accordingly, we affirm the district court's denial of summary judgment on the federal malicious-prosecution claim.**[5]**

---

**[5]**Defendants also raise their countervailing theory of the case, that "Stewart's fear and changing details in her stories was due to the intimidation she received from Plaintiffs." D. 32 (Defs.' Br. at 43). It is for the jury—not for us—to decide who intimidated whom in this case. We have no jurisdiction to weigh in at this juncture.

## VI.  MICHIGAN MALICIOUS PROSECUTION

Plaintiffs also assert a claim for malicious prosecution under Michigan common law.  To demonstrate malicious prosecution under Michigan law, a plaintiff must show:  (1) "[p]rior proceedings terminated in favor of the present plaintiff"; (2) the "[a]bsence of probable cause for those proceedings"; (3) [m]alice, defined as a purpose other than that of securing the proper adjudication of the claim"; and (4) "[a] special injury that flows directly from the prior proceedings."  *Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009) (quoting *Payton v. City of Detroit,* 536 N.W.2d 233, 242 (Mich. Ct. App. 1995)).  Because Defendants challenge only the probable-cause element and repeat the arguments made with respect to the federal malicious-prosecution claim, we reject the argument for the same reasons.

Michigan also provides qualified immunity to government officials who commit intentional torts like malicious prosecution.  *Odom v. Wayne County*, 760 N.W.2d 217, 224, 228 (Mich. 2008).  To benefit from qualified immunity, the officer must show that he took a (1) discretionary action that was (2) in the scope of his authority (or what he believed was the scope of his authority); and (3) in good faith.  *Id.* at 224–26.  Good faith carries its common-law meaning—an officer does not act in good faith when he acts "maliciously, or for an improper purpose."  *Id.* at 224 (citation omitted).  "[T]here is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another*."  *Id.* at 225.

Defendants argue that they are entitled to governmental immunity, contending that they acted without malice because "they interviewed a witness using lawful means, and acted based on a reasonable belief that probable cause existed."  D. 32 (Defs.' Br. at 48).  To be sure, "[a] police officer would be entitled to immunity . . . if he acted in good faith and honestly believed that he had probable cause to arrest, even if he later learned that he was mistaken."  *Odom*, 760 N.W.2d at 229; *see Latits v. Phillips*, 826 N.W.2d 190, 194 (Mich. Ct. App. 2012).  Here, however, as we have explained, Plaintiffs' claim is that the Defendants knew they did not have probable cause because the statement on which they relied was fabricated, or at least unreliable. *See Odom*, 760 N.W.2d at 225 (defining malicious intent to include "conduct [that] alleged[ly] shows an intent to harm or, if not that, such indifference to whether harm will result as to be the

equivalent of a willingness that it does" (citation omitted)). As we have explained, the facts taken in the light most favorable to Plaintiffs support this position, and we have no jurisdiction to consider whether the evidence *better* supports Defendants' argument that they reasonably believed that there was probable cause. Accordingly, we affirm the district court's denial of summary judgment on the Michigan malicious-prosecution claim.

## VII. *BRADY* VIOLATIONS

Plaintiffs' final claim is that Abdallah violated their due-process rights by withholding exculpatory evidence concerning Wiseman and Moore under *Brady v. Maryland*, 373 U.S. 83 (1963). A *Brady* claim has three elements: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Jackson*, 925 F.3d at 814 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Police officers, like prosecutors, have *Brady* obligations and "police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan*, 578 F.3d at 379.

With respect to Wiseman, Plaintiffs claim that Abdallah withheld *Brady* evidence that he fabricated her testimony through threats (of jail time and loss of her children) and benefits (to aid her with the shoplifting case). D. 38 (Pls.' Br. at 46). According to Plaintiffs, this information, if disclosed, "would have completely tainted the entire investigation." *Id.* And if the jury heard this information, it could have been used to impeach Stewart's credibility. *Id.* Essentially, if the jury knew how Abdallah pressured Wiseman to change her story, this evidence would have cast doubt on the integrity of the investigation and suggested that the jury should believe Stewart's recantation, rather than her initial statement. The district court agreed. *Clark*, 2023 WL 4852230, at *14.

Abdallah objects that the evidence about Wiseman was not withheld under *Brady* because it "was, or should have been, known to Plaintiffs." D. 32 (Defs.' Br. at 46). For evidence to be withheld under *Brady*, "the evidence [must] be in the exclusive control of the state." *McNeill v. Bagley*, 10 F.4th 588, 600 (6th Cir. 2021). There is no *Brady* violation when the person on trial

"knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)).  If the person on trial knows or should have known the crucial information, "there is really nothing for the government to disclose." *Id.*  So, for example, a police officer may not violate *Brady* when he withholds the statement of an alibi witness, considering that the defendant knows the essential fact—whether he was with this witness or not—and had the ability to call the witness at trial.  *McNeill*, 10 F.4th at 600.  Similarly, we held that the police did not violate *Brady* by withholding letters relating to the victim's extramarital affair when the record showed that the alleged perpetrator was fully aware of the affair and able to call witnesses to testify to that fact.  *Owens v. Guida*, 549 F.3d 399, 417 (6th Cir. 2008).

But the availability of a witness does not undermine a *Brady* claim when the criminal suspect does not know the facts essential to properly question the witness and find the exculpatory or impeaching information.  *Brady* "does not require the State simply to turn over *some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs." *Barton v. Warden*, 786 F.3d 450, 468 (6th Cir. 2015).  And we have never suggested that information concerning a *defense* witness can never be withheld under *Brady*.  Like the Seventh Circuit, we find "untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001); *see also Johnson v. Folino*, 705 F.3d 117, 130 n.7 (3d Cir. 2013) ("[I]t simply cannot be the case that any information possessed by a witness—particularly a government witness—is available as long as he or she is subject to cross-examination.").  Accordingly, in *Barton*, we held that the police violated *Brady* by withholding a supplemental, contradictory statement of a witness, even when the witness's initial statement, together with her contact information, was included in a disclosed report.  *Barton*, 786 F.3d at 467–68.  The crucial question is not whether the witness is available, but whether the person on trial was aware of the essential facts from which the *Brady* material can be discovered.

Here, the essential facts about Wiseman's testimony were withheld.  Specifically, taking the facts in the light most favorable to the Plaintiffs, the police and prosecution failed to disclose

threats and inducements made to convince Wiseman to change her story. It was not disclosed that Wiseman was coerced or that Abdallah facilitated her release from jail without bond. *Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019) (holding that *Brady* "require[s] disclosure to the plaintiffs of the coercive tactics used to obtain [a witness's] statement"). That evidence would have been useful to impeach both Wiseman's testimony and Stewart's testimony, and to cast doubt on the entire investigation. This evidence could have helped Plaintiffs "*prove* that [Wiseman's] statements were false" and undermined the credibility of Stewart's testimony. *Avery v. City of Milwaukee*, 847 F.3d 433, 444 (7th Cir. 2017). Undermining the credibility of Stewart's testimony was *critical* because she was the only purported eyewitness to the crime, and no physical evidence ever inculpated Clark or Harrington. And a defendant undoubtedly "suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness." *Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009) (collecting cases).[6]

Neither the relationship between Wiseman and Plaintiffs nor the testimony at trial undermines this analysis. As discussed above, the mere fact that Wiseman was initially a defense witness is not decisive. And Wiseman's testimony during the first trial does not demonstrate that Plaintiffs' trial counsel was "fully aware of this [information] at trial and, in fact, explored it," as the dissenting opinion argues. Dissenting Op. at 38. It is true that Plaintiffs' counsel was aware of Wiseman's initial story, new story, and the fact that her story changed after a meeting with police. She was cross-examined extensively about this at the first trial. But the trial testimony did not disclose *why* she changed her story. To the contrary, at the first trial, Wiseman repeatedly denied that she had been threatened or promised anything by the police. See D. 37 (App'x at 292, 305) (Wiseman First Trial Test. at 134, 247). Although somewhat convoluted, her testimony seemed to be that she changed her story after receiving a subpoena that warned her of the penalties for perjury. *Id.* at 323–24 (Wiseman First Trial Test.

---

[6]We lack jurisdiction to consider Defendants' additional argument that this evidence is not exculpatory because Wiseman stated in a recent deposition that she was with Stewart only *part* of the night and not during the timeframe of the murder itself, so the testimony does not exclude the possibility that Stewart witnessed the murder. *See* Defs.' Br. at 45 (citing R.138-20 (Wiseman Dep. Tr. at 19–20) (Page ID #4312–13)). Even if they were together only part of the night, Wiseman's account would still contradict Stewart's, because Stewart testified that she was home all night.

at 165–66). The only threats she mentioned were alleged threats from the Plaintiffs attempting to stop her from testifying to the new story and from warrant officers who came to enforce the prosecution's subpoena *after* she spoke to police. *Id.* at 292–93, 323–24 (Wiseman First Trial Test. at 134–35, 165–66). And although she admitted that she was released from jail after talking to Abdallah and did not have a next court date scheduled, she told the jury that she paid a bond to get out. *See id.* at 310, 318–20 (Wiseman First Trial Test. at 152, 160–62). In sum, at the first trial, neither the information about the bond payment nor the information about the threats and coercion were disclosed.[7]

The dissenting opinion mistakes the opportunity to question a witness about the relevant information with the ability to obtain the relevant information. Our analysis in *Harris v. Lafler* is instructive. In *Harris*, the police failed to disclose informal threats and promises made to the prosecution's eyewitness before trial. 553 F.3d at 1033. We held that the state violated *Brady* by failing to disclose those promises and threats even though the defendant had an opportunity to cross-examine the witness. *Id.* at 1034. We recognized that without the information about the promises and threats, defense counsel was left empty-handed when he tried to impeach the witness on the stand. *Id.* ("Even though a transcript of the hearing shows that [the defendant's] counsel anticipated that [the eyewitness] must have been promised something in exchange for his testimony, he had no way to prove it."). The same is true here. At the first trial, Plaintiffs' counsel knew Wiseman changed her story, and they asked questions on cross-examination about why she did so. But their efforts to impeach her were hampered because, taking the evidence in the light most favorable to Plaintiffs, they lacked the evidence about the threats and promises that were made to induce her to change her story.

Turning next to Moore, Plaintiffs claim that Abdallah withheld evidence that he jailed Moore for three days and threatened her with obstruction charges, pressuring her to relinquish Clark's alibi. *See* D. 38 (Pls.' Br. at 47). Plaintiffs say that withholding this information was prejudicial because it could have been used to impeach Abdallah; presenting evidence that he

---

[7]To the extent that Abdallah is arguing that Plaintiffs or their attorneys were in fact aware of the threats that Abdallah made to Wiseman, we have no jurisdiction to consider this argument because it is a dispute with the factual inferences in this case. *See* D. 32 (Defs.' Br. at 46). We consider the argument here only to the extent that it rests on the undisputed facts.

engaged in a "consistent pattern of baseless threats of jail and criminal charges if Moore did not change her story would lend credence to each of the witnesses' stories and would have decimated the integrity of the police investigation led by Abdallah." *Id.* at 48. The district court agreed. *Clark*, 2023 WL 4852230, at \*14.

Abdallah again disputes whether the evidence of Moore's coercion was actually withheld under *Brady*. D. 32 (Defs.' Br. at 45). Abdallah argues that the "essential facts" about Moore were that she was "always known to Clark," that "Clark's attorney spoke with Moore, and she was listed as an alibi" and that "Moore was ready and willing to testify—and was simply not called as a witness." D. 52 (Defs.' Reply at 11). This argument once again fails to appreciate the core of the essential-facts doctrine. Although it is relevant that Plaintiffs had access to Moore, the essential fact is that Abdallah engaged in coercive tactics to persuade her to change her story. There is no dispute that this fact was not disclosed.[8] Had this fact been disclosed and shared at trial, it would have supported Plaintiffs' theory that Abdallah engaged in a pattern of witness coercion in a bad-faith effort to pin the murder on Clark and Harrington. If presented at trial, this evidence would have further undermined the credibility of Stewart's preliminary-examination testimony and supported Stewart's claim that she had been threatened by police to point the finger at Clark and Harrington.

The dissenting opinion would also reverse the district court's *Brady* determinations on the grounds that Moore's and Wiseman's testimony is too unbelievable to survive summary judgment. According to the dissent, the witnesses' accusations of police misconduct are so incredible and uncorroborated that "we are left to wonder how the prosecutor could have fulfilled

---

[8]To be clear, we do not suggest that information held by an available witness, but not disclosed by the prosecution, is always considered suppressed under *Brady*. The question in such cases is whether the information possessed by the witness should have been discovered by defense counsel with minimal investigation. *See Jalowiec v. Bradshaw*, 657 F.3d 293, 311 (6th Cir. 2011). So, a witness's testimony is properly considered suppressed when the testimony regards information that defense counsel could not reasonably expect the witness to possess. *See, e.g.*, *Boss*, 263 F.3d at 741, 743–44. The testimony at issue here is slightly different. In many cases, defense counsel can reasonably expect a witness to have knowledge of their prior interactions with investigators. But viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that defense counsel would have been unable to discover Moore's and Wiseman's statements because there is reason to think that they would not have told defense counsel the truth about their interactions with investigators. *See Crivens v. Roth*, 172 F.3d 991, 997 (7th Cir. 1999). Considering the prior threats, a juror could reasonably conclude that Moore and Wiseman, fearing retaliation, would not tell defense counsel about the investigators' coercive tactics. That is sufficient to create a genuine dispute as to whether the evidence was suppressed under *Brady*.

his affirmative duty to learn of such information so as to share it with the defense." Dissenting Op. at 35. This is not a valid basis to reverse the denial of summary judgment because determinations about the credibility of witnesses fall squarely within the province of the jury and outside the scope of this interlocutory appeal. *See Berryman v. Rieger*, 150 F.3d 561, 564 (6th Cir. 1998) (dismissing qualified-immunity appeal for lack of jurisdiction when the dispute turned on "credibility determinations we cannot make"). Because the dissent's conclusion rests on a determination that the witnesses' testimony is not credible, we lack jurisdiction to decide the issue. *Johnson*, 515 U.S. at 313.

This case does not present the "exceptional circumstances" in which we may reject a witness's testimony on appeal because the district court's "factual determination . . . is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Adams*, 946 F.3d at 948 (quoting *Scott*, 550 U.S. at 380). Here, there is no piece of irrefutable record evidence—such as a video recording of the interactions between Abdallah and Wiseman or Moore—that directly contradicts Wiseman's and Moore's testimony. The conflicting testimony of Abdallah, *see* Dissenting Op. at 35, certainly does not fit the bill; that is a paradigmatic dispute for the jury to hear. *See Adams*, 946 F.3d at 950. The dissenting opinion also points to the conflict between Stewart's and Wiseman's accounts of what happened on the night of Martin's death. Dissenting Op. at 34–35. But the tension between those stories does not require us to reject Plaintiffs' *Brady* claim because, even if Wiseman were lying about being with Stewart on the night of the murder, it may still be true that Abdallah's undisclosed coercive tactics led Wiseman to tell a false story about her interactions with Plaintiffs' attorneys, and that the evidence of the coercion could have impeached Abdallah and lent credibility to Stewart's account that she was forced to lie. Accordingly, there is no valid basis to weigh the sufficiency of the evidence at this juncture.

Perhaps seeking to bring this argument within our limited jurisdiction, the dissenting opinion further contends that "Moore's and Wiseman's accusations are not evidence and, therefore, not *Brady* evidence." Dissenting Op. at 35. The position that allegations of police misconduct cannot support a *Brady* claim is contradicted by binding case law in this circuit. Even if *Brady* materials are typically materials and documents in a police or prosecutor's file, we have recognized that *Brady* material need appear in tangible form and that allegations of police

misconduct can independently support a *Brady* claim. *See Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (en banc) (recognizing that "a less formal, unwritten or tacit agreement is also subject to *Brady*'s disclosure mandate"); *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form."). In *Jackson*, for example, we reversed the grant of summary judgment on a *Brady* claim based on an individual's allegations that a police officer knew his false statement "had been coerced." *Jackson*, 925 F.3d at 825. Similarly, in *Harris* we reversed the denial of habeas corpus based on a witness's allegation that police officers made him informal promises in exchange for his false testimony. *Harris*, 553 F.3d at 1033–34. These cases, which the dissent fails to address, directly support the proposition that a *Brady* claim can rest on a witness's allegation of undisclosed police misconduct. The evidence here is no different: both Wiseman and Moore claim that police sought to obtain or succeeded in obtaining their false testimony through undisclosed coercion and threats.[9]

The case upon which the dissenting opinion relies, *Coleman v. Bradshaw*, 974 F.3d 710 (6th Cir. 2020), does not undermine the viability of this *Brady* theory at all. *Coleman* concerned a man who was convicted of killing a witness to keep her from testifying at his trial on drug charges. *Id.* at 713. After trial, another convicted murderer swore an affidavit stating that he killed the same woman and previously shared this information with police during an interview. *Id.* at 716–17. In *Coleman*, we recognized, in dicta, that the affidavit was not "itself . . . *Brady* evidence; It [was] evidence of alleged *Brady* evidence" that the other convicted murderer had previously confessed to the police, and that police had withheld the confession from the defense in violation of *Brady*. *Id.* at 719. In so doing, we applied the exact principle that the dissent rejects—that a witness's after-the-fact statement about their interactions with police can be evidence of *Brady* material not previously disclosed. *Coleman* came to us on habeas review, and we applied the deferential standard required by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254. Because the state court, acting as a factfinder, found that the

---

[9]The dissent also maintains our holding will open the floodgates to *Brady* claims grounded in "gamesmanship and fraud." Dissenting Op. at 36. But it is the rare defendant who will be able to overcome *Heck v. Humphrey*'s favorable termination requirement. *See* 512 U.S. 477, 486–87 (1994).

affidavit was not credible, we did not disturb that conclusion. *Coleman*, 974 F.3d at 719. This case arises in a much different procedural context. Here, at summary judgment, the district court has determined that the evidence put forth by Plaintiffs suffices to create a triable issue. We have no occasion to judge the credibility of Wiseman's and Moore's testimony; that question is left to the sound judgment of the jury. For these reasons, we will affirm the district court's denial of summary judgment on the *Brady* claims.

## VIII. CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court and **REMAND** for trial on the merits.

_____

**CONCURRENCE / DISSENT**

_____

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part. I agree with the denial of qualified immunity on the fabrication-of-evidence and malicious-prosecution claims and, therefore, concur in the Majority's analysis and judgments for those claims. But I would reverse the district court on the *Brady* claims because the allegedly withheld information is not the type of evidence that fits within *Brady*'s disclosure requirements and, even if it were, that information was readily available to defense counsel at the time of trial.

Put simply, the prosecution must disclose to the defense the evidence in its possession that is favorable to the accused. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Due to the breadth of this rule, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in th[e] case, including the police." *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quotation marks and citation omitted). But *Brady* does not require the prosecution to "make a complete and detailed accounting to the defense of all police investigatory work on a case." *United States v. Agurs*, 427 U.S. 97, 109 (1976) (quotation marks and citation omitted); *accord Arizona v. Youngblood*, 488 U.S. 51, 55 (1988). And *Brady* does not apply to information that is otherwise available to the defense. *See Henness v. Bagley*, 644 F.3d 308, 325 (6th Cir. 2011) ("Since Henness was aware of the essential facts that would enable him to take advantage of the exculpatory evidence, no *Brady* violation occurred."); *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001) ("The *Brady* rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue.").

The two *Brady* claims here concern Detective Abdallah's treatment of two anticipated defense witnesses: Tyrhonda Moore and Tammy Wiseman.[1]  When Clark was arrested, Moore went to the police station with an alibi for Clark.  Moore contends that Det. Abdallah berated her and accused her of lying, threatened to arrest her unless she changed her story, and *locked her in jail for three days!*  As far as I can tell, there is no record of her being held in jail; there is only this alarming claim.  And she says that despite this, she never changed her story, but Abdallah released her from jail anyway.  Ultimately, Moore did not testify, but according to Clark, "alibi witness Tyrhonda Moore was subpoenaed and ready to testify at [his] trial, but was never called as a witness."  *Clark v. Romanowski*, No. 08-10523, 2010 WL 3430782, at *10 (E.D. Mich. Aug. 30, 2010).  So, the story is that after three days of unlawful incarceration—which she withstood without relenting—Moore was released and went to testify at Clark's trial, but never told Clark's attorney about any of it.  That defies belief.  And Abdallah has denied it entirely; he denied that he threatened or jailed her, and insisted that was a lie.  But Clark and Harrington ask us to presuppose that Moore's accusation is true, construe that unbelievable and contested accusation

---

[1]A third *Brady* claim concerned a woman named Kaneka Jackson.  In 2015 (12 years after the trial), Jackson swore out an affidavit and mailed it to Clark in prison, whereupon he used it to seek habeas relief.  In that affidavit, Jackson claimed that she saw Martin's murderer and it was not Clark; she saw a tall, dark skinned man with a silver handgun pressed to the back of Martin's head walk him into the woods, heard three gunshots, and then saw the gunman run out of the woods alone.  The district court judge accepted this affidavit as true and granted Clark habeas relief.  *Clark v. Nagy*, No. 2:16-cv-11959, 2018 WL 3239619 (E.D. Mich. July 3, 2018).  The government appealed.

At a hearing to consider Clark's motion for release on bond pending appeal, two witnesses testified: Jackson and CIU Detective Patricia Little.  Jackson's testimony was markedly different from her affidavit: she said she saw Martin and another man walk past her apartment and later heard some shots, but she was inside the house and did not see anything else—she did not see a gun or a man run away.  Det. Little produced recordings of prison phone calls between Clark and Jackson that suggested that Clark would be paying Jackson for her assistance.  But the district court reasserted its belief in Jackson's story and ordered Clark released from prison immediately.  Three days later, the Sixth Circuit ordered Clark back to prison.  Eventually, the Sixth Circuit reversed the grant of habeas relief and remanded for an evidentiary hearing on the truth of the affidavit.  *Clark v. Warden*, 934 F.3d 483 (6th Cir. 2019).

In December 2019, while Clark's habeas petition was proceeding on remand, the Michigan Innocence Clinic submitted a report to the CIU on behalf of Kevin Harrington, asserting that both men were actually innocent.  But that report also stated that "the account of Kaneka Jackson [was] inconsistent and unreliable," and gave several specific reasons why she was "not credible."  And, when Clark and Harrington filed this lawsuit, the defendants deposed CIU Director Valerie Newman, who said that CIU found Kaneka Jackson "not credible, and we did not rely on her in any way, shape, or form," and "didn't believe her at all."

In this case, Clark and Harrington pressed a *Brady* claim based on Jackson's story and that she told it to Inkster Police Officer Greg Hill when it happened.  Despite its unwavering belief in Jackson's story, the district court denied the *Brady* claim because there was no evidence that Det. Abdallah and Sgt. Smith would have been aware of that information.  *Clark v. Abdallah*, No. 21-10001, 2023 WL 4852230, at *16 (E.D. Mich. July 28, 2023).

as "evidence," and find that Abdallah violated *Brady* by failing to disclose that "evidence" to defense counsel—that is, by failing to tell defense counsel that he had illegally jailed Moore to coerce her to change her story. That is an odd view of *Brady* evidence.[2]

Meanwhile, when Tammy Wiseman was arrested for shoplifting, the police discovered that she had been subpoenaed and intended to testify that the prosecution's sole eyewitness, Bearia Stewart, could not have seen the murder because she was with Wiseman at the time (about 10 or 11 p.m. on that Thursday night). But when she testified at trial, Wiseman denied that she was with Stewart and said that Harrington's attorney had convinced her to lie about it. Wiseman later recanted that testimony, claiming that Stewart *was* with her on the night of the murder, and that she had lied at trial because Det. Abdallah had threatened her and promised to help her with her shoplifting charge in exchange for the false testimony. Abdallah has denied this. Wiseman's current story is that Stewart brought her two children to Wiseman's house on the Thursday afternoon before the murder, spent that evening with Wiseman, and left the children sleeping at Wiseman's when she (Stewart) went "to make a run" at about midnight. Stewart did not return, but called Wiseman at 8:30 or 9 a.m. on Friday morning to tell her about Martin's murder. While that is a reasonable story, it contradicts every version of Stewart's story. Stewart has never in any version of her story said that she was with Wiseman on the night of the murder. From the very beginning, Stewart said she was at home with her children, that her seven-year old son got off the school bus at 3 p.m. on Thursday, that they were outside riding bikes, had dinner and baths, and she walked him to the bus stop at 7 a.m. on Friday, when Martin's body was found. Stewart's most extensive testimony about her amended version of the story—in which she did not witness anything to do with the murder—was during the fourth trial

---

[2]Typically, *Brady* evidence or *Brady* materials are documents or records that are contained in a police or prosecutor's file, and are (or could be) obtained later through a Freedom of Information Act type request. *See*, *e.g.*, *Brady*, 373 U.S. at 84 (the prosecutor withheld a written statement "in which [the accomplice had] admitted the actual homicide"); *Agurs*, 427 U.S. at 100 (the murder victim's prior criminal record); *United States v. Bagley*, 473 U.S. 667, 671 (1985) (receipts for payments to the prosecution's witnesses for their testimony against Bagley); *Kyles v. Whitley*, 514 U.S. 419, 428-29 (1995) (witness statements, internal memos, and notes in the investigatory files); *Strickler*, 527 U.S. at 266 ("documents prepared by [the key eye-witness], and notes of interviews with her, that impeach significant portions of her testimony"); *Cone v. Bell*, 556 U.S. 449, 459 (2009) (witness statements, police reports, and police bulletins supporting Cone's drug addiction); *Turner v. United States*, 582 U.S. 313, 321-23 (2017) (police and prosecutor's notes obtained from a "postconviction review of the prosecutor's files"); *Glossip v. Oklahoma*, 604 U.S. --, 2025 WL 594736, at *3 (U.S. Feb. 25, 2025) (file notes concerning Glossip's mental health).

(Harrington's final re-trial), in which she stated unequivocally that she was at home that night and her children were with her. When asked about Wiseman, Stewart revealed that Wiseman had hired Stewart an attorney, who was there to represent Stewart while she testified, and that Wiseman was cousin to Kevin Harrington's half-brother, Michael—but Stewart never said she was with Wiseman on the night of the murder. Both stories could be false, but both cannot be true: Stewart and her children could have been at their home, or they could have been at Wiseman's house, but not both. If Stewart's amended story is also true, as we assume for purposes of resolving Abdallah's summary-judgment motion, then Wiseman's contradictory story is not. But Clark and Harrington ask us to presuppose that Wiseman's story is true, construe her accusations as "evidence," and find that Abdallah violated *Brady* by failing to disclose that "evidence" to defense counsel—that is, by failing to tell defense counsel that he had threatened and bribed Wiseman to coerce her to change her story. Again, this is an odd view of *Brady* evidence.

I would hold that Moore's and Wiseman's accusations are not evidence and, therefore, not *Brady* evidence. *Cf. Coleman v. Bradshaw*, 974 F.3d 710, 719 (6th Cir. 2020) ("The affidavit itself is therefore not *Brady* evidence: It is evidence of alleged *Brady* evidence."). These are very serious but uncorroborated, long-after-the-fact accusations, both of which Abdallah emphatically denies. Neither accusation has led to any other evidence, such as a jail record, an interview note, or an unidentified witness. These are, at the very most, accusations of police misconduct and accusations are not evidence. Moreover, given Abdallah's denial and the absence of any corroborating proof, we are left to wonder how the prosecutor could have fulfilled his affirmative duty to learn of such information so as to share it with the defense. *See Strickler*, 527 U.S. at 281.

Put another way, exactly what is the "evidence" that would have been produced at trial if not for Det. Abdallah's purported suppression? It was certainly *not* testimony by Abdallah that he unlawfully threatened and coerced Moore and Wiseman—if he had been questioned about that at trial, he certainly would have denied it entirely, as he has denied it every time that he has been asked about it since then. Nor is there any tangible document or uncalled witness. This would-be "evidence" is solely Moore's and Wiseman's stand-alone accusations. And, given

Abdallah's denials, these accusations were not known to (i.e., *in the possession of*) the police or prosecutor. This becomes *Brady* evidence only if Moore's and Wiseman's accusations are proven true (and Abdallah's denials false), which requires a jury's finding (or a presumption). So, on remand, Clark and Harrington will present these accusation-based *Brady* claims to a jury. Then, only if the jury finds that Abdallah did commit the misconduct (i.e., the jury finds *Brady* violations) will there be any *Brady* evidence to support that *Brady* claim. The finding of the violation creates the evidence that proves the violation. Because if the jury finds no facts to support a *Brady* violation (i.e., that Abdallah did not commit the misconduct), then there was no *Brady* evidence to disclose in the first place.

Presupposing or pretending that such uncorroborated, after-the-fact accusations are *Brady* evidence that could have been and should have been disclosed long ago risks opening the door to gamesmanship and fraud. It takes little imagination to see how. If every post-hoc accusation is *Brady* evidence, then any sufficiently creative accusation, regardless of its truth, becomes an actionable *Brady* claim. A prisoner produces an unscrupulous witness who falsely claims that she went to the police station to provide an alibi and the officer frightened her into leaving without giving the alibi; the officer's failure to disclose that scare tactic to the defense creates a viable *Brady* claim; and post-conviction counsel (or, as here, a plaintiff's § 1983 counsel) can have a jury decide whether to believe the witness that it happened or the police officer that it did not.

In addressing this dissent, the Majority reads it to say that I would reverse the *Brady* determination merely because I disbelieve Moore and Wiseman. To be sure, I do not believe either of them; nor do I think that reasonable jurors would likely believe them, just as no one (other than the district court judge) has ever believed Kaneka Jackson. *See* fn. 1, *supra*. But that is actually beside the point. My point is that this is not *Brady* evidence because these accusations are not evidence that falls within the *Brady* construct, regardless of whether the accusations are true or false. Obviously, if the accusations are false, then the alleged threats and coercion never happened, so Det. Abdallah (wholly unaware of the later-arriving false accusations) had no such information to disclose under *Brady*, and such nonexistent events are indisputably not *Brady* evidence.

But even if these accusations were true—and believable—they are mischaracterized as *Brady* evidence and miscast as *Brady* claims. Moore and Wiseman contend that Abdallah used unlawful threats and abuse towards coercing their false incriminating testimony. As the Majority ably explained in its fabrication-of-evidence analysis, this states a colorable claim that Abdallah violated Clark's and Harrington's clearly established due-process rights. *That* is the claim. There is no benefit to force-fitting this alleged misconduct into a *Brady* claim (and, as I see it, a certain detriment to doing so). If Abdallah unlawfully tampered with their testimony through threats and coercion, then the fabrication-of-evidence claims succeed and the harm has been proven.

The clear unbelievability of Moore's and Wiseman's post-hoc accusations is relevant, as I see it, mostly as a demonstration of our deference to the jury question in a summary judgment (and qualified immunity) analysis. Even though I do not believe them, their testimony is nonetheless evidence of Abdallah's alleged fabrication of evidence and malicious prosecution, which is properly admissible for a jury to consider in those claims. But these accusations also demonstrate how easy it is to concoct a false *Brady* claim based on an uncorroborated, long-after-the-fact accusation. That is what Clark and Kaneka Jackson did, and that concoction—which has an impressive array of nonbelievers—would still be here if Jackson had claimed she told Abdallah (instead of claiming she told Lt. Hill, who has since died). *See* fn.1, *supra*. Regardless, the point is that these accusations, whether they are believed or not, are simply not *Brady* evidence.

Here, however, even if Moore's and Wiseman's accusations were evidence, there would be no *Brady* violation given that both were named defense witnesses who either did testify (Wiseman) or were available to testify (Moore) at trial. So, whatever happened with Det. Abdallah prior to trial, defense counsel had full opportunity to learn that information from Moore and Wiseman.

Just to play this out, suppose that Det. Abdallah did unlawfully jail and threaten Moore to discourage her from testifying as an alibi witness for Clark, and further suppose that he even wrote a memo about it but withheld that memo from the prosecutor and the defense. While that memo (and the information therein) would be *Brady* evidence, there would still not have been a

*Brady* violation because Clark's attorney could have, should have, and would have learned that information from Moore. Moore was Clark's voluntary, proactive alibi witness and she was not only known to Clark's attorney, she was on his witness list and had been subpoenaed to appear at trial to testify. And obviously she would know all about Abdallah's jailing and threatening her. Even if Moore did not rush to tell defense counsel about this after her release from incarceration, all of this would have been revealed if defense counsel had called her to testify and simply asked: "You went to the police station with an alibi for Clark—what happened?" Abdallah's failure to disclose this information about Moore would not have kept it from Clark.

The same applies for Wiseman. Even supposing that Det. Abdallah did coerce Wiseman to change her story through threats and promises, Clark's and Harrington's attorneys were well aware of that at trial. They had initially subpoenaed Wiseman as a defense witness, but she appeared at trial as a prosecution witness after changing her story (from impeaching Stewart's testimony to accusing Harrington's attorney of suborning perjury). And during that testimony, both defense counsel were fully aware that she had changed her story after and because of her police station interaction with Abdallah, and both pressed her about whether she had changed her story due to threats or promises. She denied (repeatedly) that she received anything, but conceded that Abdallah had her released from jail and actually drove her home, and that her shop-lifting case had not proceeded since then. She then admitted on cross-examination that she changed her story due to the threat of prosecution. Abdallah did not keep this information from Clark and Harrington; their counsel were fully aware of all of this at trial and, in fact, explored it. "The *Brady* rule does not assist a defendant who is aware of essential facts that would allow him to take advantage of the exculpatory evidence at issue." *Coleman*, 268 F.3d at 438.

The Majority characterizes this as my suggesting an absolute rule—i.e., that information from a defense witness can never be withheld under *Brady*—and succinctly rejects that rule. But that is not what I meant to say. I mean only that the information from *these* defense witnesses, under *these* circumstances was not withheld because—given the enormity of the accusations and the relationship of the defendants to these witnesses—defense counsel in *this* case could have and should have learned of these accusations from the witnesses, if the accusations were true.

I would reject the *Brady* claims because the allegedly withheld information is not the type of evidence subject to *Brady*'s production and disclosure requirements and, even if it were, that information was available to defense counsel at the time of trial. I concur in all other respects.