RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0053p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

DARELL DEON CHANCELLOR,

        *Plaintiff-Appellant*,

*v.*

STEPHEN GEELHOOD; CITY OF DETROIT, MICHIGAN,

        *Defendants-Appellees*.

No. 25-1424

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-11616—Linda V. Parker, District Judge.

Argued: January 28, 2026

Decided and Filed: February 25, 2026

Before: SUTTON, Chief Judge; STRANCH and LARSEN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Christopher P. Desmond, VEN JOHNSON LAW, PLC, Detroit, Michigan, for Appellant. Josephine A. DeLorenzo, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees. **ON BRIEF:** Christopher P. Desmond, VEN JOHNSON LAW, PLC, Detroit, Michigan, for Appellant. Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees.

─────────────

## OPINION

─────────────

LARSEN, Circuit Judge. In 2011, Officer Stephen Geelhood sought a search warrant to investigate narcotics sales from a home in Detroit. After a magistrate judge granted the warrant, Geelhood and a group of other officers searched the home of Janet Chancellor. There, they found over 500 grams of cocaine. Based on this and other findings, Janet's son, Darell

Chancellor, was arrested, prosecuted, and eventually sentenced to fourteen years and three months in prison for possession of illegal narcotics.  Seven years later, the local prosecutor's office vacated his conviction via a stipulated order.  Chancellor then sued in federal court, alleging that Geelhood violated his state and federal rights.  The district court granted summary judgment to Geelhood.  Chancellor now appeals.  We AFFIRM.

I.

In November 2011, Officer Stephen Geelhood requested a warrant to search a home in Detroit for illegal narcotics.  Geelhood signed an affidavit stating that he had received a tip from a credible and reliable confidential informant that heroin was being sold and stored at the home.  Geelhood further stated that he had used the same confidential informant on more than three prior occasions that had resulted in the successful confiscation of illegal drugs and firearms, with cases pending in two local courts.  Geelhood also stated that, after receiving the tip, he personally surveilled the property and saw a black male engage in three suspected hand-to-hand drug transactions; the person he observed was in his thirties, stood five feet eight inches tall, and weighed 180 pounds.  The warrant affidavit did not identify any person by name.

The magistrate judge approved the search warrant.  That same day, Geelhood and other members of the Detroit Police Department Narcotics Section executed the warrant at the home, which belonged to Janet Chancellor.  During the raid, Geelhood confiscated 571 grams of cocaine from a laundry hamper full of men's clothes located on the second floor.  The cocaine was split between four plastic baggies within a larger plastic bag.  Another officer seized two firearms from the same hamper, and a third officer found a letter from the Michigan Department of Treasury addressed to Darell Chancellor on the table above the hamper.  The officers also ran a LEIN inquiry that listed Darell Chancellor as being registered at the home address.

A month later, a fourth officer prepared an investigator's report, seeking a warrant for Darell Chancellor's arrest based on the findings from the raid.  The investigator's report included statements from Geelhood and other officers about the raid; it did not include statements about Geelhood's pre-raid surveillance.  The magistrate issued a warrant to arrest Chancellor for possession of a controlled substance with intent to deliver, possession of a controlled substance,

felon in possession of a firearm, and a felony firearm second offense. Chancellor was arrested pursuant to the warrant during a traffic stop several months later. Geelhood was not present for Chancellor's arrest. Chancellor was then charged with the same offenses listed in the arrest warrant.

Chancellor had a bench trial in Wayne County Circuit Court. Geelhood, some of the other officers present at the raid, and Chancellor's parole officer testified at trial. Janet Chancellor did not testify. Neither did her boyfriend or daughter, who also lived at the house. Chancellor, however, did testify on his own behalf. Chancellor maintained that he was not present on the property during the surveillance and that he did not fit the physical description of the person Geelhood described as the seller in his affidavit. Chancellor is 5'11" and testified that he weighed 245 pounds at the time of the search, while the search warrant identified the seller as three inches shorter and 65 pounds lighter. Chancellor further testified that he lived at a different property with his wife and child.

Geelhood testified that Chancellor was the person he saw engaging in the hand-to-hand drug transactions on the night of the surveillance. He further testified that he discovered and seized cocaine from the laundry hamper during the raid. The trial judge ultimately convicted Chancellor of constructively possessing the cocaine found in the laundry hamper. But the judge found insufficient proof that Chancellor had possessed the drugs with intent to distribute, so the judge acquitted him of that charge. Chancellor was sentenced to 14 years and 3 months to 30 years imprisonment for possession of over 450 grams of cocaine. A divided panel of the state court of appeals affirmed Chancellor's conviction, *People v. Chancellor*, 2014 WL 6865488, (Mich. Ct. App. Dec. 4, 2014) (per curiam), and the Michigan Supreme Court denied leave to appeal, *People v. Chancellor*, 864 N.W.2d 334 (Mich. 2015) (mem.). Chancellor then petitioned for habeas relief in federal court, which was denied. *Chancellor v. Woods*, 2016 WL 4729664, at *1 (E.D. Mich. Sep. 12, 2016), *aff'd,* 2017 WL 4513125 (6th Cir. Aug. 16, 2017).

In 2017, the Wayne County Prosecutor's Office created a Conviction Integrity Unit (CIU). Chancellor asked the CIU to review his case in 2018. CIU investigators interviewed Chancellor's mother, her boyfriend and ex-boyfriend, as well as Chancellor's ex-wife and sister. They did not interview Geelhood or any of the other government officials involved in

Chancellor's trial and prosecution. But the CIU ultimately concluded that Chancellor's conviction should be vacated because "too many of Sgt. Geelhood's reported claims about the events . . . cannot be corroborated or have been credibly refuted" and because "officers in this narcotics group, including . . . Geelhood, are currently being investigated." R.72, Memo, PageID 1640. In 2020, a state judge issued a stipulated order vacating Chancellor's conviction and sentence that was signed by CIU Director Valerie Newman and Chancellor's defense attorney. Chancellor was then released from prison after spending more than seven years incarcerated.

After his release, Chancellor sued Geelhood under 42 U.S.C. § 1983, asserting Fourth Amendment claims for false arrest, false imprisonment, and malicious prosecution, as well as a Fourteenth Amendment due process claim for failure to comply with duties derived from *Brady v. Maryland*, 373 U.S. 83 (1963). He also brought state law claims for false arrest, malicious prosecution, false imprisonment, and gross negligence.[1] Chancellor's federal and state claims centered on his allegations that Geelhood lied in the search warrant affidavit and failed to disclose that lie during Chancellor's prosecution. Geelhood and the City moved for summary judgment. The district court granted the motion, concluding that Geelhood was entitled to qualified immunity for the Fourth Amendment claims and that there was no issue of material fact underlying Chancellor's *Brady* claim. With respect to the state law claims, the court found that Geelhood was entitled to governmental immunity from Chancellor's claims of false arrest, malicious prosecution, and false imprisonment and that Chancellor had failed to state a claim for gross negligence. Chancellor now appeals.

## II.

We review the district court's summary judgment decision de novo. *Butler v. City of Detroit*, 936 F.3d 410, 416 (6th Cir. 2019). "Summary judgment is warranted only if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 417 (citation modified); *see also* Fed. R. Civ. P. 56(a). In reviewing a motion for summary

---

[1]Chancellor also sued the City of Detroit under a theory of municipal liability. The district court dismissed that claim on procedural grounds related to the City's bankruptcy. Claims against the City form no part of this appeal.

judgment, we view the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A.

On appeal, Chancellor makes two arguments based on federal law. First, he argues that Geelhood falsified the search warrant affidavit, leading to Chancellor's arrest, imprisonment, and prosecution without probable cause. Second, he argues that Geelhood violated his due process rights by withholding exculpatory evidence. We address each in turn.

1.

Chancellor argues that Geelhood lied in the affidavit supporting the search warrant, resulting in a lack of probable cause to support the search of the home where the drugs were found. In response to Geelhood's assertion of qualified immunity, the district court concluded that Chancellor had not put forth sufficient evidence to create a triable issue of fact on that question. We agree.

i.

Taking the case as the parties framed it, Chancellor's Fourth Amendment claims fail because, as the district court concluded, Chancellor cannot show that Geelhood lied in the search warrant affidavit. So he cannot overcome Chancellor's qualified immunity defense.

To bring his § 1983 suit alleging misrepresentation by a police officer, Chancellor must first overcome Geelhood's assertions of qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation modified) (per curiam). A facially valid search warrant is generally a complete defense to a claim that an officer searched a premises without probable cause. *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020). But that principle yields when an officer deliberately or recklessly makes material false representations in the warrant affidavit. *Id.* When a plaintiff claims in a § 1983 suit that a police officer lied in a search warrant affidavit, "we have distilled a specific [qualified immunity] inquiry." *Butler*, 936 F.3d at 418. In such cases, a plaintiff can overcome

qualified immunity only if (1) he can make "a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth" and (2) he can show "that the allegedly false or omitted information was material to the finding of probable cause." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003).

"Implicit in *Vakilian*'s demanding standard is the recognition that a police officer swearing out an affidavit can make mistakes and yet remain protected by qualified immunity." *Butler*, 936 F.3d at 418. "We have never required that police officers be infallible to avoid liability under 42 U.S.C. § 1983." *Id.* at 417. This mental state requirement makes sure that officers are sued only for true malfeasance.

To show recklessness or deliberateness, it is often not enough for a plaintiff merely to contradict an affidavit. *See id.* at 419. That's because "even taking [the plaintiff's] version as true," evidence contradicting the affidavit will often support either "a bald-faced lie" or be "just as consistent with negligence or innocent mistake." *Id.* So to overcome qualified immunity, Chancellor must present "evidence of facts known to [Geelhood]" that show that "no reasonable officer with access to the contradictory information would have sworn out such an affidavit." *Id.* Chancellor cannot make this showing based on the record evidence.

Start with the text of the search warrant affidavit. Geelhood stated that he received information about the home from a credible and reliable informant who reportedly knew there was a large amount of heroin being sold and stored at the house in question. Geelhood also stated that he had used the same confidential informant on more than three other occasions that had resulted in the confiscation of drugs or firearms, with criminal cases ongoing in two local courts. In addition, he stated that he had surveilled the home himself, during which he observed at least three persons go to the address, converse with a purported seller, and then exchange money for suspected heroin. He described the purported seller as a black male in his thirties, 5'8", and 180 pounds. Geelhood concluded by stating that his 17 years of experience as a police officer and 9 years in the narcotics division gave him further reason to suspect that illegal drug activities were taking place at the house. Geelhood never identified Chancellor anywhere in the search warrant affidavit.

On its face, the affidavit provided probable cause to search Janet Chancellor's home. "[P]robable cause is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citation modified). It does not require a "preponderance of the evidence" or "proof beyond a reasonable doubt." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (citation omitted); *see also United States v. Santiago*, 139 F.4th 570, 574 (6th Cir. 2025) (noting that probable cause requires less than a preponderance of the evidence). It requires only "the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Harris*, 568 U.S. at 244 (citation modified). Geelhood's affidavit provided two sources of knowledge: a confidential informant and independent surveillance. Taken together, these sources provided probable cause to search the house. *See United States v. Jones*, 159 F.3d 969, 974 (6th Cir. 1998) ("Knowledge of illegal drug activities, obtained by law enforcement officials through a confidential informant and independent surveillance, supports a district court's finding of probable cause to support the issuance of a warrant.").

Chancellor, however, claims that the affidavit contains three falsehoods. He contends that: (1) there was no confidential informant, or if there was, that he or she was not credible; (2) Geelhood never surveilled the property; or (3) if Geelhood did surveil the property, he never saw Chancellor sell drugs. But Chancellor does not present evidence creating a genuine issue of material fact on these claims.

The third claim is easily dispensed with because the search warrant affidavit never identified Chancellor as the man Geelhood saw dealing drugs. It merely said that Geelhood saw an unidentified black man, 5'8" tall, weighing 180 pounds, engaging in three drug transactions. To cast doubt on the latter claim, Chancellor offers the testimony of Janet Chancellor's boyfriend, Alvin Thomas, and an expert affidavit by law enforcement consultant Ken Katsaris. Chancellor's brief in this court states that Thomas, "reported being on the porch during the time in question" and "denied observing any drug dealing." Appellant Br. at 32. But that is not a fair representation of Thomas's deposition testimony. Thomas never testified that he didn't observe drug dealing during the time he was on the porch. He never denied seeing dealing at all. The closest he gets is stating that he never saw anyone "bring cocaine into the house." R. 81-19, Thomas Dep., PageID 3374. And that statement is not at all connected to the timeframe when

Thomas was on the porch. In other words, Thomas says that he never saw any cocaine deliveries to the house; he didn't deny what Geelhood claims—that he saw heroin, cocaine (or some other drug) *leaving* the house. What's more, Thomas's testimony *confirms* the search warrant's claim that there was a black man, around 180 pounds, and 5'8" on the porch that night. Thomas, who is 5'6½" tall, 185 pounds, opined that "one of the officers may have actually seen [him] on the front porch" that night. *Id.* at 3379, 3383–84. And, to repeat, the affidavit never identified Chancellor as the man Geelhood saw on the porch.

Chancellor's expert affidavit fares no better. Chancellor's appellate brief states that his expert "is of the opinion" that "the lighting and Geelhood's distance from [the home]" indicates that "Geelhood would have not been able to identify illegal activity at the property." Appellant Br. at 32. But this also mischaracterizes what the witness said. Katsaris did not offer expert testimony about whether Geelhood could have seen the porch from his vantage point that evening. Katsaris instead stated that he had reviewed some of the testimony and exhibits in this case. He then recited a list of facts drawn from those materials, which included Geelhood's statements that he had surveilled the home from "approximately 300–400 feet away . . . in the 'late evening,'" and had witnessed three hand-to-hand drug transactions. R. 81-14, Expert Aff., PageID 2987. Katsaris then stated that he was of the "opinion that Geelhood's surveillance of the property was insufficient to give him probable cause that illegal activity was occurring at the property." *Id.* Katsaris offered no reason for reaching that conclusion. Chancellor—and his expert—must do more than disagree with the magistrate's ultimate finding of probable cause. Instead, they must present "evidence" showing that "no reasonable officer with access to the contradictory information would have sworn out such an affidavit." *Butler*, 936 F.3d at 419. But Chancellor's expert merely puts forth his own legal conclusion. That's not enough.

Chancellor also cannot show that Geelhood failed to surveil the home. He references Janet Chancellor's testimony for the proposition that she "would have been aware of [Geelhood] if he were surveilling as he stated." Appellant Br. at 32. But this assertion is not backed by sufficient facts. Geelhood testified at trial that he was 300 to 400 feet away and viewing the house with binoculars at around five or six in the evening. Janet's testimony does not provide sufficient evidence to create a genuine dispute of material fact on those points. She maintained

that "we would have noticed" if a narcotics officer was surveilling the home. She noted that many of the neighboring lots and homes were vacant, and she believed that if neighbors had seen Geelhood they would have called her. R. 81-2, Janet Chancellor Dep., PageID 1991, 1993–95. She also mentioned that there were no streetlamps, so it would have been hard to see in the dark. But Geelhood testified that it was not pitch black when he was viewing the home. And if it were darker, then that also would have limited Janet's ability to see a car doing surveillance. This does not qualify as "significant probative evidence" demonstrating more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citations omitted).

As for the confidential informant, Chancellor points out that there is no contemporaneous record of the informant's identity, and Geelhood testified that he could not remember his name. It may indeed be best practice to keep track of an informant's identify, but a lack of identifying documents, without more, is not the kind of "contradictory information" sufficient to show a culpable mental state. *Butler*, 936 F.3d at 419. Chancellor's own expert has testified that "it was Detroit's policy, practice, or procedure to not require its narcotics officers to document the identities of CIs." R. 81-14, Expert Aff., PageID 2990. In any case, information obtained from a confidential informant can be sufficient to establish probable cause if the judge "can conclude independently that the informant is reliable" or if "the affidavit contains corroborating information." *United States v. Helton*, 35 F.4th 511, 518 (6th Cir. 2022) (citation modified). An informant's tip has "greater reliability" if the affidavit "avers that the name of the confidential informant has been disclosed to the issuing judge." *United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005). But the source need not be "named in the affidavit," *Helton*, 35 F.4th at 519 n.1, and "failure to identify the informant to the issuing magistrate" does not make the warrant "presumptively void." *May*, 399 F.3d at 824. Instead, "facts that support the accuracy of the information supplied by the informant" can still provide probable cause. *Id.* Sufficient supporting facts include information that the "cooperating source has provided assistance in unrelated drug investigation cases." *Id.* at 826.

Here, Geelhood provided additional facts, *id.*, that this confidential informant had been used on more than three other occasions resulting in three arrests "with cases pending in [the]

36th district and 3rd circuit court," R. 50-2, Search Warrant Aff., PageID 474; *see also Butler*, 936 F.3d. at 423 (stating that "the necessary proof of the informant's reliability is in the very first affidavit paragraph:  he (or she) had previously provided reliable information in four successful narcotics investigations").  And Geelhood's "independent corroboration" of the informant's tip further establishes probable cause.  *United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000).

Chancellor also urges us to rely on the testimony of CIU Director Valerie Newman for the general proposition that Geelhood's identification of Chancellor "does not ring true." Appellant Br. at 30.  But Chancellor conceded at oral argument and in his briefing here and below, that it was not until trial that Geelhood identified Chancellor as the 5'8" 180-pound individual Geelhood mentioned in the search warrant affidavit.  Newman's testimony about Geelhood's identification of Chancellor therefore assesses Geelhood's *trial* testimony, not the search warrant affidavit, which did not identify Chancellor at all.  Newman did acknowledge that "there's no way to independently verify Geelhood's statements in the search warrant affidavit." R. 81-13, Newman Dep., PageID 2782.  She further stated that "nothing in and of itself . . . is the ah-ha moment."  *Id.* at 2783.  Instead, each little inconsistency from the entire search "pieced together" created her belief that Geelhood lied throughout the case.[2]  *Id.*  But her testimony largely relies on the same underlying evidence that we have already found to be insufficient. And to whatever extent Newman relies on CIU witness interviews, those interviews have not been presented to this court.  Nor can we rely on internal CIU policies in place of our own analysis of the distinct legal question presented to us—whether Geelhood is entitled to qualified immunity.  As before, the absence of records from which we can now independently verify Geelhood's claims regarding the reliability of the informant in the affidavit is "just as consistent with negligence" as with a "bald-faced lie."  *Butler*, 933 F.3d at 419.

---

[2]For the first time on appeal, Chancellor points to Newman's testimony that only the Johnson family—and thus not Chancellor—could sell drugs in Janet Chancellor's neighborhood.  But this argument also does not contradict the search warrant affidavit, which did not identify Chancellor as the suspected dealer.  In any event, this argument was not presented to the district court, and we will not consider factual arguments made for the first time on appeal.  *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) ("This Court will not entertain on appeal factual recitations not presented to the district court any more readily than it will tolerate attempts to enlarge the record itself.")  The same can be said for Chancellor's arguments regarding other instances of officer misconduct in Detroit.

In sum, Chancellor's assertions about the search warrant do not show the existence of a genuine dispute of material fact sufficient to overcome Geelhood's assertion of qualified immunity.

ii.

Having resolved this question on the grounds presented by the parties, we pause to note our puzzlement at the parties' framing of the issue. We have repeatedly held that "a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort." *Claybrook v. Birchwell*, 199 F.3d 350, 357–58 (6th Cir. 2000). Here, even if Chancellor *had* put forth a triable issue on whether the search warrant lacked probable cause, it is not clear to us how that would show a direct violation of *Chancellor's* constitutional rights.

It is undisputed that police executed the search warrant at a home belonging to Chancellor's mother. And Chancellor's sworn testimony at trial—indeed his entire defense— was that he did not live at that house and was not there the night of Geelhood's surveillance. Chancellor has maintained that position in this § 1983 suit. That poses a problem for Chancellor's ability to show that he is the "a direct victim" of a constitutional tort. *Claybrook*, 199 F.3d at 357.

The Fourth Amendment right against unreasonable searches and seizures is a personal right. *United States v. Russell*, 26 F.4th 371, 374 (6th Cir. 2022). That means that "a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). Because Chancellor insists that "he did not reside at the house in question," Appellant Br. at 10, he cannot claim that *his* Fourth Amendment right against unreasonable searches was violated, even if the officers searched his mother's home without probable cause, *Rakas*, 439 U.S. at 134; *see also United States v. Salvucci*, 448 U.S. 83, 88–89 (1980) (noting that a defendant's possession of a seized good is not sufficient to establish Fourth Amendment standing).

Perhaps realizing that a claim directly challenging the constitutionality of the search would fail, Chancellor has tried another tack. He argues that Geelhood violated Chancellor's

*own* Fourth Amendment rights to be free from false arrest, false imprisonment, and malicious prosecution, each of which *resulted from* the illegal search of his mother's home. But we have doubts that this attempt to bootstrap his lawsuit to his mother's constitutional rights can succeed as a legal matter.

The Fourth Amendment claims Chancellor brings in this lawsuit (false arrest, false imprisonment, and malicious prosecution) have something in common with a claim for illegal search or seizure: each requires the plaintiff to show an absence of probable cause. *Tlapanco*, 969 F.3d at 652, 654. But to prove an illegal search claim, a plaintiff must show a lack of probable cause *to search* the plaintiff's person or property. Chancellor's claims, by contrast, require an absence of probable cause *to arrest* and *to prosecute*, respectively.[3] *Id.* at 652 ("To prevail on a false arrest claim under § 1983, a plaintiff must prove that the arresting officer lacked probable cause to arrest the plaintiff." (citation modified)); *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (noting that a plaintiff must prove a lack of probable cause "for the criminal prosecution").

Chancellor tries to elide the difference. He attempts to prove the lack of probable cause to *arrest* and *prosecute* him by arguing a lack of probable cause *to search* his mother's house. Begin with the complaint. Chancellor's theory was that "the false claims made and sworn to b[y] Geelhood in the search warrant affidavit led directly to the issuance of the search warrant, the raid at [his mother's home], the seizure of the cocaine and to [Chancellor's] subsequent prosecution." R. 13, Second Am. Compl., PageID 99. And "[a]s a direct result of Geelhood's false affidavit, [Chancellor] was arrested in May of 2012 and held in Wayne County Jail until his trial date." *Id.*; *see also id.* at 102 (describing "[Chancellor's] false arrest that arose from Geelhood's falsified search warrant and affidavit"). Chancellor's response to Geelhood's motion for summary judgment followed the same reasoning. *See* R. 81, Res. to Mot. for Summ. J., PageID 1794 ("Simply put, the magistrate who approved the warrant in this case . . . [was] not privy to the fact that Geelhood was lying in his search warrant affidavits."); *id.* at 1795 ("[T]he [search warrant] affidavit in this case was wholly dependent on Geelhood's credibility, had the

---

[3]Chancellor's false imprisonment claim "arises out of an alleged false arrest," so we analyze that claim as "false arrest." *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020).

magistrate or judge been aware of Geelhood's illegal and perjurious behavior, there is no basis to conclude the warrant would have still been issued, evidence would not have been suppressed and Darell would not have been convicted."). For the most part, so does his brief on appeal.

In other words, Chancellor's theory is that Geelhood's allegedly falsified search warrant affidavit led to the unconstitutional search of his mother's house, which in turn led to his eventual arrest, prosecution, and imprisonment for possession of cocaine. But Geelhood's search warrant affidavit never connected Chancellor with the house, whether truly or falsely. The affidavit just said that a confidential informant had told Geelhood that drugs were stored and sold at the house, and that, during surveillance, Geelhood had witnessed an *unidentified* man making three hand-to-hand drug sales.

Geelhood would later testify at Chancellor's trial that Chancellor was the person he saw during the surveillance. But that testimony obviously came after the search, the arrest, and the decision to prosecute, so it could not have caused those events. Other than this trial testimony, the parties have identified no other place in the record where Geelhood identified Chancellor as the dealer he saw during surveillance. Indeed, Chancellor conceded at oral argument that the first time Geelhood identified Chancellor as the dealer was during Chancellor's trial. And Geelhood is absolutely immune for the testimony he gave at trial. *Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009).

Even though the affidavit did not name Chancellor as the suspected dealer, it is of course true that the affidavit, and the ensuing search of Chancellor's mother's house, was a but-for cause of Chancellor's subsequent arrest and prosecution. Without the warrant, the police would not have entered the home or found the drugs and evidence suggesting they belonged to Chancellor. But other circuits have held that it goes too far to allow a plaintiff to recover damages for a subsequent arrest or prosecution simply because an illegal search put the wheels in motion; and that is true even when the plaintiff's *own* property was the place illegally searched. *See Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999); *Hector v. Watt*, 235 F.3d 154, 157 (3d Cir. 2000), *as amended* (Jan. 26, 2001); *Martin v. Marinez*, 934 F.3d 594, 606 (7th Cir. 2019).

These courts offer three reasons for their conclusion. First, as a product of the exclusionary rule, the fruit of the poisonous tree doctrine does not apply in § 1983 cases. *Townes*, 176 F.3d at 145–46; *Martin*, 934 F.3d at 599. Our circuit agrees. *See Codrington v. Dolak*, 142 F.4th 884, 895 (6th Cir. 2025). Second, the Supreme Court has suggested that damages for constitutional violations should not extend further than the "interests protected by" the constitutional guarantee. *Hector,* 235 F.3d at 157 (quoting *Carey v. Piphus*, 435 U.S. 247, 265 (1978)); *see also Martin*, 934 F.3d at 601 (discussing *Carey*). Because the "evil of an unreasonable search or seizure is that it invades privacy," victims of such conduct "may recover damages directly related to" that interest—"including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution," because no privacy interest would be served. *Townes*, 176 F.3d at 148; *see also Hector*, 235 F.3d at 157 ("[D]amages for an unlawful search should not extend to post-indictment legal process," because they "are too unrelated to the Fourth Amendment's privacy interests."). And finally, allowing such suits would be inconsistent with the common law, the "starting point for inquiry under § 1983." *Hector*, 235 F.3d at 155, (quoting *Heck v. Humphrey*, 512 U.S. 477, 483 (1994)); *see* Akhil Reed Amar, *The Constitution and Criminal Procedure* 20–27 (1997); *id.* at 27 (noting that a "two-century tradition of civil damage actions in America" shows that a plaintiff complaining of an illegal search could only recover damages from the search, not from "[t]he factual harms of seizure, evidentiary use, conviction, and sentence").

Whatever the wisdom of these opinions, it is certainly not *clearly established* that an officer could be liable in such circumstances. Much less so here, where Chancellor seeks to hold Geelhood liable for his arrest and prosecution that resulted from the violation of *his mother's* privacy rights.

Finally, it is important to note what Chancellor has not argued in this case. The parties do not dispute that a facially valid arrest warrant is normally sufficient to establish probable cause to arrest. *See Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). As with a search warrant, an arrest warrant's presumption of validity gives way when an officer knowingly falsifies the materials supporting the magistrate's issuance of it. *Id*. at 677 n.4. But

Chancellor has not argued that the investigator's report supporting his arrest warrant was falsified.  In his briefing to the district court, Chancellor recited the correct legal standard—"'[a] false arrest claim . . . requires a plaintiff to prove that the arresting officer lacked probable cause *to arrest* the plaintiff.'"  R. 81, Res. to Mot. for Summ. J., PageID 1793 (citation omitted) (emphasis added).  But, consistent with the allegations in his complaint, Chancellor attempted to show this only by claiming that "Geelhood was lying *in his search warrant affidavit*[]."  *Id.* at 1794 (emphasis added).  He generally repeats that framing on appeal.

Nor did Chancellor explain what role Geelhood played in securing the arrest warrant: other officers applied for the warrant and effectuated Chancellor's arrest.  *See Tlapanco*, 969 F.3d at 652 n.2 (assuming without deciding that someone other than the arresting officer may be sued for false arrest if the officer "was responsible for swearing out the affidavit upon which the arrest warrant relied").  Defendants raised this point in their motion for summary judgment, but instead of responding with facts showing false statements in the arrest warrant application or Geelhood's responsibility for them, Chancellor merely asserted that "it is uncontested that it was Geelhood who[] prompted the *search* of the [home on] 32nd St, and Darell's subsequent arrest and criminal charges, which were the precipitating events of the prosecution."  R. 81, Res. to Mot. for Summ. J., PageID 1797 (emphasis added).  Likewise, Chancellor did not point the district court to facts showing "that [Geelhood] influenced or participated in the decision to prosecute," as is required for malicious prosecution.  *Tlapanco*, 969 F.3d at 655 (citation modified).  Accordingly, the district court did not address any alleged false statements in support of the *arrest* warrant or the *prosecution*; the court instead followed the parties' lead and trained its focus on the *search* warrant affidavit.  Chancellor has not argued in this court that the district court erred in this regard.

2.

Chancellor also fails to show a genuine dispute of material fact that Geelhood violated his due process rights by failing to produce material, exculpatory evidence during the criminal prosecution as required by *Brady*, 373 U.S. at 87.  "A criminal defendant suffers a due process violation when the prosecution fails to turn over favorable evidence that would materially aid in his defense."  *Est. of Andrews v. City of Cleveland*, 112 F.4th 436, 443 (6th Cir. 2024) (citing

*Brady*, 373 U.S. at 87). "Police share this obligation." *Id.* at 443. But their duties are complete when they provide the information to the prosecutor; police have no duty to ensure it reaches the defendant. *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014). For a *Brady* violation, Chancellor must show three things: "(1) the existence of favorable evidence, either exculpatory or impeaching; (2) that the evidence was suppressed; and (3) that the suppression resulted in prejudice." *Hill v. Mitchell*, 842 F.3d 910, 926 (6th Cir. 2016) (opinion of McKeague, J.) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

Chancellor fails to show that Geelhood suppressed any *Brady* information in this case. He primarily argues that Geelhood was required to tell the prosecutor that he falsified information in the search warrant affidavit. Even assuming that a *Brady* claim could lie in such circumstances,[4] we explained above why Chancellor has not shown a question of material fact that Geelhood lied in the affidavit. So any *Brady* claim premised on failure to disclose the alleged falsification likewise fails. Chancellor also argues that Geelhood violated his *Brady* obligations by failing to turn over evidence showing that Chancellor did not match the physical description of the man in the search warrant affidavit. But Chancellor already knew that his own physical appearance differed from the description provided in the search warrant, and he, in fact, based his trial defense on that discrepancy. "[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (citation omitted).

B.

Finally, Chancellor appeals the district court's denial of his state claims for gross negligence, false arrest, false imprisonment, and malicious prosecution.

---

[4]Although Chancellor frames his argument as a *Brady* violation, his argument more naturally fits as a fabrication-of-evidence claim. *See Jackson v. City of Cleveland*, 925 F.3d 793, 815 (6th Cir. 2019); *Clark v. Abdallah*, 131 F.4th 432, 447 (6th Cir. 2025). But even if he had brought a fabrication claim, he has not shown a genuine dispute of material fact that "the evidence was knowingly fabricated," so that argument would likewise fail. *Clark*, 131 F.4th at 448.

1.

Chancellor's gross negligence claim fails. Michigan law immunizes state-government employees acting within the scope of their employment from tort liability, unless their actions are grossly negligent. *Mays v. Governor of Mich.*, 954 N.W.2d 139, 198 (2020) (citing Mich. Comp. Laws § 691.1407(2)). But Michigan's "governmental immunity statute does not itself create a cause of action called 'gross negligence.'" *Cummins v. Robinson Township*, 770 N.W.2d 421, 433 (Mich. Ct. App. 2009) (per curiam). Instead, the plaintiff must identify a common-law duty. *See Beaudrie v. Henderson*, 631 N.W.2d 308, 315 n.12 (Mich. 2001). When the plaintiff has done so, showing mere negligence on the officer's part will not subject the officer to liability for breach. Instead, the statute requires that the officer's conduct rise to the level of "gross negligence." Mich. Comp. Laws § 691.1407(2)(c).

Below, Chancellor claimed that Geelhood was grossly negligent when he "knowingly falsified the contents" of the search warrant affidavit and "knowing[ly] executed the search warrant." R. 13, Second Am. Compl., PageID 106; *see also* R. 81, Resp. to Mot. for Summ. J., PageID 1810 (arguing that "Geelhood . . . intentionally fabricate[d] evidence"). But these are the same acts underlying Chancellor's claims for false arrest, false imprisonment, and malicious prosecution. Michigan does not permit a claim for gross negligence premised on intentional acts. *See, e.g.*, *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004) (noting that when a gross negligence claim is "fully premised" on intentional tort, the "plaintiff did not state a claim on which relief could be granted" (citations omitted)) *abrogated on other grounds by Odom v. Wayne County*, 760 N.W.2d 217 (Mich. 2008); *Hill v. City of Detroit*, 2021 WL 137381, at *2 (Mich. Ct. App. Jan. 14, 2021) (finding plaintiff's gross negligence claim barred because it "relied on the same 'wrongful conduct' as his intentional tort claims" for false arrest and malicious prosecution). Now on appeal, Chancellor changes tune and states that Geelhood was grossly negligent because "[h]e spoke to no witnesses, took no notes, [and] documented nothing." Appellant Br. at 47. But we decline to consider this argument raised for the first time

on appeal. *See Peet v. City of Detroit*, 502 F.3d 557, 568 (6th Cir. 2007). So Chancellor's gross negligence claim fails.[5]

2.

Chancellor's other state claims also fail. Chancellor has not provided a single state case or state-specific argument regarding false arrest, false imprisonment, or malicious prosecution. He instead rests on his "lengthy [federal] arguments regarding probable cause." Appellant Br. at 41. So we will do the same. Above we concluded that Chancellor's federal claims fail because he has not shown a lack of probable cause sufficient to overcome Geelhood's assertion of qualified immunity. As Chancellor has framed the case, that is sufficient to dispose of his state claims as well on state governmental immunity grounds.

* * *

We AFFIRM.

---

[5]The district court granted summary judgment to Geelhood because it found that Chancellor failed to identify a specific duty under Michigan law. But "[w]e may affirm on any basis supported by the record." *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024).